# In the United States Court of Federal Claims

No. 15-77C
(Filed Under Seal: May 11, 2015)
(Reissued for Publication: June 2, 2015)[*]

```
*************************************
RAYTHEON COMPANY,                  *
                                   *
          Plaintiff,               *
                                   *
 v.                                *
                                   *
THE UNITED STATES,                 *
                                   *
          Defendant,               *
                                   *
and                                *
                                   *
LOCKHEED MARTIN CORPORATION        *
and NORTHROP GRUMMAN SYSTEMS       *
CORPORATION,                       *
                                   *
          Defendant-Intervenors.   *
*************************************
```

Bid Protest; Proposed Corrective Action
Based on GAO Attorney's Statements
During an Outcome Prediction Conference;
Scope of the Court's Review; Motion to
Supplement the Administrative Record;
Motion to Strike Document From the
Administrative Record; Cross-Motions for
Judgment on the Administrative Record;
Noncompliance With Solicitation's
Evaluation Scheme; Misleading and
Unequal Discussions

<u>Mark D. Colley</u>, Washington, DC, for plaintiff.

<u>Steven M. Mager</u>, United States Department of Justice, Washington, DC, for defendant.

<u>Marcia G. Madsen</u>, Washington, DC, for Lockheed Martin Corporation, and <u>Deneen J. Melander</u>,
Washington, DC, for Northrop Grumman Systems Corporation, for defendant-intervenors.

## <u>OPINION AND ORDER</u>

**SWEENEY**, Judge

In this bid protest, plaintiff Raytheon Company ("Raytheon"), the contract awardee,
challenges both the statements made by a Government Accountability Office ("GAO") attorney
during an outcome prediction conference held in conjunction with protests lodged by defendant-
intervenors Lockheed Martin Corporation ("Lockheed") and Northrop Grumman Systems

---

[*] This reissued Opinion and Order incorporates the agreed-to redactions proposed by the
parties on May 29, 2015. The redactions are indicated with bracketed ellipses ("[. . .]").

Corporation ("Northrop"), and the decision of the awarding agency to take corrective action after hearing those statements. Presently before the court are Northrop's motion to supplement the administrative record, Raytheon's motion to strike a document from the administrative record, and the parties' cross-motions for judgment on the administrative record. As explained more fully below, the court denies Northrop's motion to supplement the administrative record, grants Raytheon's motion to strike, denies Raytheon's motion for judgment on the administrative record, and grants the remaining cross-motions for judgment on the administrative record.

## I. BACKGROUND

### A. Earlier Phases of the Procurement

Several years ago, the United States Air Force ("Air Force") initiated the Three-Dimensional Expeditionary Long-Range Radar ("3DELRR") acquisition program to replace its existing AN/TPS-75 radar system.[1] AR 38928-29. The first phase of the program–the Technology Development phase–included two risk reduction periods. Id. at 38929-30. During the first risk reduction period, two contractors built and demonstrated radar system prototypes. Id. For the second risk reduction period, also referred to as the pre-Engineering and Manufacturing Development ("pre-EMD") period, the Air Force awarded contracts to Raytheon, Northrop, and Lockheed to complete preliminary design reviews of their radar systems and demonstrate their prototypes. Id. at 38929, 38931.

During both risk reduction periods in the Technology Development phase, a team of independent subject-matter experts ("independent review team") with expertise in radar system design, hardware, software, testing, and signal processing performed a Technology Readiness Assessment of each radar system. Id. at 2377-79, 38930-31, 40614, 40625. The assessment began with the identification of the radar system's critical technology elements ("CTEs"). Id. at 2377-78, 40614. The independent review team used the following definition to guide its identification of CTEs:

> "A technology element is 'critical' if the system being acquired depends on this technology element to meet operational requirements (within acceptable cost and schedule limits) and if the technology element or its application is either new or novel or in an area that poses major technological risk during detailed design or demonstration."

---

[1] The facts in the background section are derived solely from the administrative record ("AR"), with one minor exception: the date and time that a specific document included in the administrative record was transmitted to the GAO was taken from an electronic-mail message to which the document was attached. That message, which is not in the administrative record but is attached as an exhibit to Raytheon's motion to strike ("Mot. Strike Ex."), is relevant only to the resolution of the motion to strike, and not to the merits of Raytheon's protest.

Id. at 40625 (quoting Department of Defense, Technology Readiness Assessment (TRA) Deskbook ("TRA Deskbook") 1-1 (July 2009)[2]; see also id. at 2382 ("[T]he technologies of interest here are not routine engineering or integration risk elements.  They are items that require more than the normal engineering development that would occur in design for production as opposed to technology maturity programs."  (Department of Defense, Technology Readiness Assessment (TRA) Guidance ("TRA Guidance") 2-11 (Apr. 2011))).  Once the CTEs were identified, the independent review team evaluated the technological maturity of each CTE and then assigned each CTE a Technology Readiness Level ("TRL").  Id. at 2378-79, 38930-31, 40614.  As set forth in Interim Department of Defense Instruction ("DoDI") 5000.02 (Nov. 26, 2013), TRLs are meant to "be used to benchmark technology risk," but are "rough benchmarks, and not conclusive about the degree of risk mitigation needed prior to development."  Id. at 40398 (Interim DoDI 5000.02, § 5.d(4)(b)(3)).  Indeed, TRLs "can serve as helpful knowledge-based standard and shorthand for evaluating technology maturity, but they must be supplemented with expert professional judgment."  Id. at 2371 (TRA Guidance 1-1); accord id. at 2377 ("TRLs will be used as a knowledge-based standard or benchmark but should not substitute for professional judgment tailored to the specific circumstances of the program."  (TRA Guidance 2-5)).  With respect to the 3DELRR procurement, the contractors were required during the Technology Development phase to produce and demonstrate a functioning radar system prototype in which all CTEs were assigned a TRL of at least six.  Id. at 40626.  A CTE would be considered to be TRL 6 if the "[s]ystem/subsystem model or prototype" was "demonstrat[ed] in a relevant environment."  Id. at 2385 (TRA Guidance 2-13).

At the conclusion of the pre-EMD period, after the demonstrations of the radar system prototypes, the independent review team prepared a Technology Readiness Assessment report for each contractor.  Id. at 40614.  In its report for Raytheon, the team described Raytheon's proposed radar system as being composed of [. . .] subsystems.  Id. at 40617.  One of those subsystems, the [. . .] subsystem, included the antenna assembly, which consisted of [. . .] Transmit/Receive Line Replaceable Units ("TRLRUs") [. . .].  Id. at 40619, 40631.  Each TRLRU contained [. . .].  Id. at 40631.  And, each T/R module consisted of [. . .], a circulator, [. . .], a gallium nitride high power amplifier ("GaN HPA"), [. . .].[3]  Id. at 40631.  Some of the components of each T/R module [. . .], while the circulators [. . .].  Id. at 40631.  The following figure depicts Raytheon's TRLRU:

---

[2]  The July 2009 version of the Technology Readiness Assessment (TRA) Deskbook is not included in the administrative record.

[3]  Broadly speaking, when a transmit signal is generated by the radar system, it travels through the GaN HPA, which boosts the signal, then through the circulator, and finally through the radiator into open space.  AR 76562.27.  When the energy sent into open space is reflected back to the radar system, it passes through the radiator, the circulator, and then the rest of the "receive path."  Id. at 76562.28.  The circulator protects the transmit and receive sides of the T/R module from interfering with each other.  Id. at 76562.43-.44, .104.

[. . .]

Id.

The independent review team identified six CTEs for Raytheon's radar system; of relevance here is Raytheon's CTE 1, the Gallium Nitride High Power Amplifier [. . .] ("GaN HPA [. . .]"). Id. at 40614. The team described this CTE as a "[. . .]."[4] Id. at 40630-31. It provided the following rationale for identifying the GaN HPA [. . .] as a CTE:

[. . .]

Id. at 40632; see also id. at 40632-36 (describing test results for the TRLRU, [. . .], [. . .], and [. . .]). In other words, notwithstanding its initial description of CTE 1 as the GaN HPA [. . .], the independent review team considered the GaN HPA and [. . .] as the new and novel critical technologies that required TRL assessment. Id. at 40632.

The independent review team ultimately determined that Raytheon had demonstrated all of its CTEs in a relevant environment and therefore assessed each CTE as TRL 6. Id. at 40626, 40630-54, 40658.

## B. The Solicitation for the Current Phase of the Procurement

Indeed, the Air Force concluded that all three contractors–Raytheon, Northrop, and Lockheed–successfully "demonstrated mature, low risk radar designs ready for transition" into the next phase of the procurement, Engineering and Manufacturing Development ("EMD"). Id. at 38931. The purpose of the EMD phase was "to develop, build, and test" a radar system "to verify that all operational and derived requirements [were] met and to support production or deployment decisions." Id. at 40403 (Interim DoDI 5000.02, § 5.d(9)(a)). Design changes were anticipated during the EMD phase, id. (Interim DoDI 5000.02, § 5.d(9)(b)(1)(a)), and the phase would conclude after the design had stabilized, id. at 40404 (Interim DoDI 5000.02, § 5.d(9)(d)).

Accordingly, on November 15, 2013, the Air Force issued solicitation FA8730-13-R-0001 to the three contractors with the intent to award one of them a contract to proceed in the EMD phase. Id. at 40186-87, 41237. Of the fifteen contract line item numbers ("CLINs") included in the solicitation, only one was not an option CLIN: CLIN 0001. Id. at 40187-96. This Fixed-Price-Incentive-Firm CLIN required the successful contractor to develop three 3DELRR systems.[5] Id. at 40187, 41237.

---

[4] Lockheed describes Raytheon's GaN HPA [. . .]. Lockheed Cross-Mot. for J. on the Administrative R. 10, 35.

[5] The option CLINs were a combination of Fixed-Price-Incentive-Firm, Firm-Fixed-Price, and Cost-Plus-Fixed-Fee CLINs. AR 40188-96.

In section L of the solicitation, the Air Force described the proposal requirements.  Id. at 41234-79, 53772-73.  Two of those requirements are relevant to this protest.  First, in the technical volumes of their proposals, the contractors were to identify all CTEs that had changed since the pre-EMD period, provide the TRLs of those CTEs, and substantiate the TRLs with supporting data.  Id. at 41250.  Second, in the cost/price volumes of their proposals, the contractors were to identify and support their proposed cost reductions.  Id. at 41261.  With respect to this latter requirement, the solicitation provided:

6.3.5.2  Cost Reductions

6.3.5.2.1  Management Reduction

If estimated costs to perform the proposed effort have been decreased due to a management decision, the Offeror shall provide a summary of the reduction by major cost element summary and complete rationale for the reduction.

6.3.5.2.2  Commonality with Other Programs

Any cost reductions made in the Offeror's proposal that are attributed to commonality with other programs, company-funded efforts, or capitalization of equipment shall be supported with the following information:

| (a) Commonality | The Offeror shall identify the specific program(s) and why it is applicable.<br>The Offeror shall address the cost allowability and allocatability of this action per [the Federal Acquisition Regulation ("FAR")] and their [Cost Accounting Standards ("CAS")] Disclosure Statement. |
|---|---|
| (b) Company-Funded Efforts | The Offeror shall identify the specific efforts, the planned start and end dates, the applicability to the current solicitation, the source of company funding and how they plan to account for or allocate these costs in accordance with generally accepted accounting principles, and your CAS Disclosure Statement, if applicable. |
| (c) Capital Equipment | The Offeror shall identify the specific item(s) capitalized and what other applications exist for the equipment, provide corporate approvals for each action, address the cost allowability and allocability of the action per the FAR and their CAS Disclosure Statement. |

Id. at 41261-62.

Then, in section M of the solicitation, the Air Force described how it would evaluate the contractors' proposals. Id. at 40364-77. Of particular relevance in this bid protest, the Air Force indicated that it would evaluate the contractors' proposals for technical compliance and technical risk under three technical subfactors. Id. at 40368, 40371-73. For each subfactor, the Air Force would assign technical compliance and technical risk ratings of Acceptable or Unacceptable. Id. at 40368, 40371-72. And, in evaluating the contractors' proposals under Technical Subfactor 1, System Design and Performance, the Air Force would "determine if the subfactor [was] met based on":

> 2.4.1.1 Whether the proposal substantiates the ability to design, develop, and test a radar that . . . meets the system performance requirements [described elsewhere in the solicitation].
>
> . . . .
>
> 2.4.1.3 Substantiation of at least a Technology Readiness Level 6 (TRL 6) for all Critical Technology Elements (CTEs) of the design solution that have changed since the Pre-EMD Preliminary Design Review (PDR). One CTE must be a Gallium Nitride (GaN) High Power Amplifier (HPA)-based Transmit/Receive (T/R) module.

Id. at 40372.

Also relevant to this bid protest are the Air Force's criteria for evaluating the contractors' proposed costs and prices. Id. at 40374-76. The Air Force indicated that it would first assess whether the contractors' cost/price proposals were reasonable and realistic. Id. at 40374-75. Next, for each proposal, it would calculate a total evaluated price. Id. at 40375-76. Then, it would apply a decrement factor to the contractors' total evaluated prices; if a contractor's radar system prototype exceeded the threshold range capability set forth in the solicitation's requirements, the contractor's total evaluated price could be reduced by as much as $155 million. Id. at 40368-69, 40372, 40376. This reduction would result in a Best Value Assessment. Id. The Air Force indicated that it intended to award a contract "to the Offeror with acceptable technical compliance, acceptable technical risk, . . . and the lowest [Best Value Assessment] (utilized for evaluation purposes only)." Id. at 40369.

## C. The Contractors' Proposals

All three contractors with pre-EMD contracts–Raytheon, Northrop, and Lockheed–submitted proposals pursuant to the EMD solicitation. Id. at 73324. Two aspects of the proposals are pertinent to the issues in this bid protest: the portions of Raytheon's technical volume related to its CTE 1 and the portions of the contractors' cost/price volumes related to proposed cost reductions.

In its technical volume, Raytheon described the [. . .] subsystems of its proposed radar system.  Id. at 48392-404.  The description of its [. . .] subsystem was consistent with the description contained in the Technology Readiness Assessment report prepared by the independent review team during the pre-EMD period; Raytheon did not indicate any significant changes.  Id. at 48393-97.  Indeed, in another portion of its technical volume, Raytheon expressly represented that since the pre-EMD period, it had not introduced any "new technologies" to its "design solution."  Id. at 48096.  Raytheon further represented that its CTEs had not changed and that its prototype "successfully demonstrated all Pre-EMD phase CTEs at TRL 6 and the overall design maturity in a relevant environment."  Id. at 48096-97.  However, as reflected in the following figure depicting the TRLRU that Raytheon included in its proposal, Raytheon did change the design of its TRLRU.  Compare id. at 40631 (pre-EMD design), with id. at 48382 (EMD proposal design).  Specifically, Raytheon [. . .].  See id. at 48382 (containing Figure II-1.0.1-6, which includes a depiction of Raytheon's redesigned TRLRU), 52911 (containing Raytheon's rationale for the design change).

[. . .]

Id. at 48382.

Turning to the cost/price volumes, the three contractors proposed vastly different approaches to reducing the costs of contract performance.  In its proposal, Raytheon identified [. . .] in cost reductions:  [. . .] for independent research and development ("IR&D"), and [. . .].  Id. at 48688-98.  In contrast, Lockheed proposed [. . .].  Id. at 42067.  And, Northrop identified [. . .] cost reductions totaling [. . .].  Id. at 47078-81.  Northrop explained that although its cost proposal provided the "Air Force with cost savings directly attributable to [. . .]," its proposal was [. . .].  Id. at 47085.  It bears noting that the [. . .] described by Northrop included [. . .].  Id. at 47086-87.

After accounting for their cost reductions, Raytheon offered the lowest total price of $134,546,302, id. at 51001; Northrop offered [. . .], id. at 51456; and Lockheed offered [. . .], id. at 50533.  All three contractors proposed prices that [. . .].  Id. at 73572.

## D. Discussions

Upon receiving the proposals, the Air Force determined that all were in the competitive range.  Id. at 52239-42, 73324.  It therefore initiated discussions with all three contractors.  Id. at 73324.  One of the technical discussion items is relevant to this protest.  In Evaluation Notice ("EN") RAY-TECH1-025, the Air Force requested information from Raytheon regarding its proposed production cost savings.  Id. at 52909-10.  In its response to the EN, Raytheon included the following information:

[. . .]

Id. at 52911.  The Air Force reviewed this response and ultimately deemed the discussion issue resolved.  Id. at 52913.

In addition, a number of discussion items pertaining to the contractors' cost/price proposals bear on the issues raised in this protest.  For example, in EN NG-CP-003, the Air Force requested that Northrop provide information, such as "[. . .]/IR&D planning statements," to substantiate how it planned to fund contract performance during three specified fiscal years.  Id. at 52482.  Northrop responded:  "The execution of this contract does not require [. . .] IR&D funding, and [Northrop] has the resources to implement this financial offer . . . ."  Id. at 52483.  The Air Force considered the discussion issue resolved.  Id. at 52484.

The Air Force also sent similar ENs to Raytheon and Northrop regarding the reasonableness and realism of their proposed cost reductions.  Id. at 52558-60, 52813-15.  Both EN RAY-K-016 and EN NG-K-011 provided:

> The Government is concerned with the reasonableness and realism of any affordability initiative offered.  It is imperative the Offeror substantiate and the Government fully understand any claimed initiative which the Offeror desires to incorporate into its proposed cost/price.
>
> . . . .
>
> In accordance with (IAW) FAR 31.205-18 and [10 U.S.C. § 2320], any cost claimed or considered to be IR&D or a capital investment shall not be allowable as indirect charges for work implicitly required for performance (necessary to perform the contract) or explicitly required to be done by the terms of the contract.  Any such costs should be considered as direct charges to the 3DELRR contract.  Further, unless properly segregated and agreed to as unallowable costs IAW FAR Part 31, any such costs may be deemed unrealistic.
>
> Any cost reduction efforts specifically expended for or anticipation of the 3DELRR requirements should be considered to be generated in performance of Government funded contract requirements . . . .
>
> In addition, any methodology proposing savings, which could be considered contingent on future events may be considered speculative and unrealistic as regards savings on the efforts proposed for purposes of the cost/price used in the Best Value Assessment.

Id. at 52559, 52814.  In the same ENs, the Air Force proposed the use of a special contract clause ("section H clause") "[t]o ensure the proposed savings, incorporated into [the contractors'] proposed price, are determined reasonable and realistic."  Id.

The contractors' responses to this EN were quite different.  Raytheon, after discussing its cost reduction efforts with the Air Force during a March 5, 2014 conference call, explained in its response to the EN that it received:

> 2.  Raytheon's proposal is compliant with the FAR and government accounting rules governing the appropriate charging of IR&D, [. . .].  The Government states that [any] 'cost claimed to be IR&D or capital investment shall not be allowable as indirect charges for work "implicitly" required for performance (necessary to perform a
> contract)'.  This Government interpretation of rules on allowability of IR&D costs was specifically rejected by the United States Court of Appeals for the Federal Circuit [("Federal Circuit")] in ATK Thiokol Inc. v. United States, 598 F.3d 1329 (Fed. Cir. 2010).  The Federal Circuit held that research and development costs are allowable as IR&D costs unless specifically required by the contract.  598 F.3d at 1334-35.  [. . .]

> Raytheon carefully reviewed the scope of the IR&D [. . .] to ensure they are compliant with the above current rules.  [. . .]  Raytheon assumes that the government will evaluate Raytheon's proposal consistent with the rules as interpreted by the Federal Circuit.

> . . . .

> 6.  In accordance with Raytheon's [. . .], IR&D [. . .].

Id. at 52817-18.  In addition, Raytheon proposed the use of a modified version of the section H clause suggested by the Air Force in which it agreed to expend [. . .] for IR&D, [. . .] in performing the contract.  Id. at 52818-21.  The Air Force's only comment on Raytheon's response was:  "A follow-up EN has been generated to address the H Clause for Raytheon . . . ." Id. at 52821.

In contrast to Raytheon, Northrop did not take issue with the Air Force's stated interpretation of FAR 31.205-18 and 10 U.S.C. § 2320 in its response to the EN that it received. Id. at 52560-61.  Rather, its focus was on the Air Force's proposed section H clause:

> [. . .]

Id.  Upon reviewing this response, the Air Force commented:  "The offeror has substantiated their initiatives to reduce the proposed cost/price. . . .  A Section H Clause will be proposed to NG in a follow-up EN to capture how their [. . .] will affect the contract."  Id. at 52562.

After the Air Force received the responses to ENs RAY-K-016 and NG-K-011, it contacted the Defense Contract Management Agency ("DCMA") with questions regarding the

contractors' concerns with its proposed section H clause, and its General Counsel with questions regarding IR&D. Id. at 53852, 58971. On March 19, 2014, Air Force representatives received input from Steve Trautwein of the DCMA.[6] Id. at 58691. Mr. Trautwein subsequently agreed to assist the Air Force with its evaluation of the cost/price proposals. Id. at 38970, 58691, 58966, 73139.

After conferring with Mr. Trautwein, the Air Force sent follow-up ENs to Raytheon and Northrop. In the follow-up EN that it sent to Raytheon (RAY-K-016a), the Air Force did not address Raytheon's statements regarding IR&D, but did propose another version of the section H clause, [. . .]. Id. at 59412-13; see also id. at 58696 ([. . .]). After a conference call with the Air Force, Raytheon responded with another modified version of the section H clause that [. . .]. Id. at 59415-16. The Air Force was satisfied with Raytheon's response and deemed the EN resolved. Id. at 59416.

In the follow-up EN that it sent to Northrop (NG-K-011a), the Air Force did not mention IR&D. Id. at 59389-90. Instead, as it did with Raytheon, the Air Force proposed another version of the section H clause. Id. In response, after reiterating its position that such a clause was unnecessary, Northrop proposed [. . .]. Id. at 59390-92. The Air Force commented that another follow-up EN would be sent to Northrop with a final version of a section H clause, and that no response from Northrop aside from an acknowledgment of receipt would be required. Id. at 59392; see also id. at 60825-26 (EN NG-K-011b).

The Air Force did not send Lockheed an EN similar to ENs RAY-K-016 and NG-K-011. Rather, during the second round of discussions, the Air Force advised Lockheed in EN LM-K-014 that its "[. . .]." Id. at 59958. In response, Lockheed [. . .]. Id. at 59960-69. Altogether, these [. . .]. Id. at 59969.

### E. Final Proposal Revisions, the Source Selection Decision, and Contract Award

At the close of discussions, the Air Force requested a final proposal revision from each contractor. Id. at 73324. In making its request, the Air Force advised all three contractors that their proposed costs and prices were, at that time, considered to be reasonable and realistic, and that the final proposal revision would be the contractors' last opportunity to update their cost/price proposals. Id. at 65227, 65231, 65238. The Air Force further advised [. . .]. Id. at 65231.

In its final proposal revision, Raytheon reduced its total proposed price to [. . .]. Id. at 73603. One factor contributing to the lower price was [. . .]. Id. at 73605-07. Of note, Raytheon [. . .] IR&D [. . .]. Id. at 73606. Northrop proposed a price of [. . .] in its final proposal revision. Id. at 73615. Although Northrop [. . .], it did not [. . .]. Id. at 73617-18. Lockheed, in its final

---

[6] The documents from this time period contained in the administrative record do not describe the substance of Mr. Trautwein's input.

proposal revision, [. . .] its total proposed price to [. . .].  Id. at 73592.  Its [. . .] price reflected, among other things, [. . .].  Id. at 73594-95.

As part of its evaluation of the contractors' final proposal revisions, the Air Force's technical evaluators reviewed Raytheon's proposal for compliance with the solicitation's technical requirements.  Id. at 72461-527.  These technical evaluators were advised by four members of the original independent review team.  Compare id. at 38945 (source selection plan), with id. at 40625 (Technology Readiness Assessment report).  With respect to the requirement that contractors substantiate TRL 6 ratings for each of the CTEs that had changed since the pre-EMD period, id. at 40372, Kevin Ray, the chief evaluator for Technical Subfactor 1, System Design and Performance, remarked:

> Raytheon substantiated all criteria listed in Section M 2.4.1.3.
>
> The Technology Readiness Assessment (TRA) Independent Review Team (IRT) assessed all Raytheon's Critical Technology Elements (CTEs) at Technology Readiness Level 6 (TRL 6) during the Pre-Engineering and Manufacturing Development (Pre-EMD) Period of the Technology Development (TD) Phase.  Raytheon listed the same CTEs in the EMD proposal as those identified in the Pre-EMD Period.  In addition, Raytheon identified one CTE as a Gallium Nitride (GaN) High Power Amplifier (HPA)-based Transmit/Receive (T/R) module which met the Government's requirement.
>
> TRA IRT members reviewed and analyzed Volume II, Paragraph 1.3, Pages II-86 to II-88.  The IRT members confirmed the CTEs listed were the original CTEs approved by the team in 2013 and there were no changes to the CTEs since the Pre-EMD Period Preliminary Design Review (PDR) where Raytheon was assessed at TRL 6.  Raytheon described each CTE in the following Volume II pages.
>
> > 1. Pages II-19 to II-21 and the classified Volume IIA, Figure IIA-1.0.1-6 System Architecture for the T/R Line Replaceable Unit (LRU) and the receive LRU.[7]

Id. at 72478-49 (footnote added).

In its Source Selection Decision Document, the Air Force noted that all three contractors had received technical compliance and technical risk ratings of Acceptable for all three technical

---

[7] Raytheon represents, and the other parties do not dispute, that "classified Volume IIA, Figure IIA-1.0.1-6" is the same as Figure II-1.0.1-6 that appears in the unclassified technical volume of its proposal.  Raytheon Mot. for J. on the Administrative R., Ex. 1.  Both figures contain the same depiction of Raytheon's redesigned TRLRU.  Id.

subfactors.  Id. at 73326.  It also indicated that all of the proposed costs and prices were reasonable and realistic, and that each contractor received the full $155 million decrement for exceeding the specified threshold range capability.  Id. at 73326-27.  Subtracting $155 million from each contractors' total evaluated price, the Air Force arrived at the following Best Value Assessments:  ($80,537,981) for Raytheon, [. . .] for Northrop, and [. . .] for Lockheed.  Id. at 73326.  Based on all of this information, the Air Force concluded:

> In accordance with the [solicitation], award is to be made to the Acceptable Offeror with the lowest [Best Value Assessment], who is deemed responsible in accordance with the FAR.  Raytheon is evaluated as Acceptable with the lowest [Best Value Assessment] and is deemed to possess the requisite technical, management and financial capability to perform the effort and is otherwise qualified within the meaning of FAR 9.104.

Id. at 73327.  It therefore awarded the contract to Raytheon.  Id. at 73327, 74952-53.

### F.  Proceedings Before the GAO

On the same date that it awarded the contract to Raytheon, October 6, 2014, the Air Force notified Northrop and Lockheed of its award decision.  Id. at 74957-60.  In its award notices, the Air Force disclosed to Northrop and Lockheed that the total value (including options) of the contract awarded to Raytheon was $71,821,520.  Id. at 74957, 74959.  It also advised both contractors of their technical ratings, total evaluated prices, and Best Value Assessments.  Id. at 74958, 74960.  Lockheed received a debriefing on October 15, 2014, id. at 75062, and Northrop received a debriefing the following day, id. at 75088.

Dissatisfied with the award decision, Northrop lodged a protest with the GAO on October 21, 2014.  Id. at 75385.  It asserted several errors with the Air Force's evaluation of proposals, none of which are at issue in this bid protest.  See id. at 75388-89.  However, in support of one of its initial protest grounds, Northrop stated:  "While the [solicitation] contemplates cost reductions from commonality with other programs, it clearly anticipates that these reductions will take the form of company funded efforts, management challenges, IR&D, shared equipment, shared supplies, economies of scale, etc."  Id. at 75420.

The following day, Lockheed also protested the Air Force's award decision at the GAO. Id. at 75480.  It then submitted a supplemental protest on October 27, 2014.  Id.  None of Lockheed's initial or supplemental protest grounds is at issue in this protest.  See id. at 75515.

After reviewing a copy of the Source Selection Decision Document that it had received from the Air Force, Northrop filed a supplemental protest with the GAO on November 14, 2014. Id. at 75456.  As with its initial protest, none of the supplemental protest grounds are at issue in this bid protest.  See id. at 75463-70.  However, in support of one of those grounds, Northrop argued that had it known that the Air Force interpreted the cost reduction provisions of the

solicitation to include IR&D cost reductions, "it would have submitted a very different proposal with different types of and larger cost reductions, resulting in a [total evaluated price] that would likely be lower than those proposed by Raytheon and Lockheed Martin." Id. at 75470.

In response to the initial and supplemental protests lodged by Northrop and Lockheed, the Air Force submitted a statement of facts, a memorandum of law, and an agency record (collectively, "the agency report") to the GAO on November 25, 2014. Id. at 75477-663. It requested that the protests be denied on their merits, contending that it "properly evaluated proposals and selected the best value Offeror in a thorough, fair, and reasonable manner" and that it "conducted this procurement in full accord with the selection criteria contained in the solicitation and in compliance with applicable procedures and regulations." Id. at 75539.

Lockheed filed a second supplemental protest on December 4, 2014, raising grounds not applicable in this protest. See id. at 75673-93. Then, on December 8, 2014, with its response to the agency report, Lockheed submitted a third supplemental protest. Id. at 75694; see also id. at 75697 (indicating that Lockheed received the agency report on November 26, 2014). One of the protest grounds in Lockheed's third supplemental protest concerned Raytheon's CTE 1; Lockheed argued that because Raytheon proposed using a TRLRU that was different from the one it demonstrated during the pre-EMD period, the Air Force improperly considered Raytheon's CTE 1 to be mature, such that it could be assessed as TRL 6. Id. at 75716-22.

Northrop also submitted a supplemental protest on December 8, 2014, in response to the agency report. Id. at 75741; see also id. at 75744 (indicating that Northrop received the agency report on November 26, 2014). In this second supplemental protest, Northrop asserted that the Air Force conducted misleading discussions. Id. at 75787-94. In particular, Northrop noted that the Air Force accepted Raytheon's understanding of the allowability of IR&D costs as an indirect charge, but never advised Northrop of its changed understanding. Id. Northrop argued that the Air Force's failure to make such a disclosure prevented it from proposing IR&D cost reductions in line with the IR&D cost reductions proposed by Raytheon [. . .]. Id. at 75793. Specifically, it contended:

> If Northrop Grumman had known of the Air Force's changed interpretation, it would have responded by protesting the interpretation's illegality and/or submitting a radically changed proposal. Northrop Grumman is a very large corporation with billions in assets and revenue. [. . .] Had Northrop Grumman known of the Air Force's expansive view of IR&D, which permitted offerors to propose IR&D that violated the FAR and the Air Force instruction provided to Northrop Grumman, Northrop Grumman could have proposed the types and quantities of IR&D [. . .].

Id. (citations omitted) (citing AR 71934, 44789); see also id. at 75753 (reflecting Northrop's understanding that "IR&D funds could not be proposed to perform any of the required development work").

In response to the additional supplemental protests lodged by Northrop and Lockheed, the Air Force submitted a supplemental statement of facts, a supplemental memorandum of law, and a supplemental agency record (collectively, "the supplemental agency report") to the GAO on December 15, 2014. Id. at 76007-187. In its supplemental statement of facts, the Air Force stated that [. . .] IR&D investments during the initial phases of the 3DELRR procurement, specifically noting that Northrop [. . .]. Id. at 76029-30 (citing AR 27566, 44794). Ultimately, it once again requested that the GAO deny the protests on their merits. Id. at 76186. All three contractors submitted comments on the supplemental agency report on December 22, 2014. Id. at 76191, 76238, 76417. Of particular note, Northrop remarked, with respect to its IR&D-related supplemental protest ground:

> [T]he Air Force appears to confuse IR&D, in general, with future IR&D to be used to perform development work required by a contract, a subset that is expressly excluded from the FAR definition of IR&D that may be charged to government contracts. Northrop Grumman has never contended that IR&D could not be used at all. It has only contended that offerors could not propose as FAR-compliant – and here, as [solicitation-] and EN-compliant – any future IR&D funding to be used to perform required development under the 3DELRR contract but charged to other contracts, which is what Raytheon [. . .] proposed.

Id. at 76248; accord id. at 76274 ("Northrop Grumman has not and does not challenge [. . .] use of already completed IR&D efforts. It has only challenged the proposed future use of IR&D to fulfill development work required by the 3DELRR contract.").

On January 6, 2015, the GAO conducted a hearing concerning the protests filed by Northrop and Lockheed. Id. at 76656. During the hearing, Mr. Ray testified regarding, among other things, Raytheon's change to the design of its TRLRU. He emphasized that the Air Force considered the GaN HPA and [. . .] as the new and novel critical technologies that required TRL assessment. Id. at 76562.38-.41, .44, .59, .68, .76, .91, .114-.115, .135. In contrast, the Air Force did not consider the circulator to be a critical technology, id. at 76562.60-.62, .128-.129, even though the circulator was required for the T/R module to function properly, id. at 76562.79-.80. Based on all of these understandings, the Air Force determined that although [. . .] the circulator [. . .] would require [. . .] to be redesigned, neither of the critical technologies in CTE 1 (the GaN HPA and [. . .]) were affected by the design change. Id. at 76562.44-.47, .68-.69, .116, .128-.129, .132, .134-.135. In fact, the Air Force did not believe that [. . .] the circulator would impact performance. Id. at 76562.99. As a result, the Air Force did not request, and Raytheon did not provide, any information regarding the proposed redesigned [. . .], such as the new design or test data. Id. at 76562.88, .93-.94, .97-.98, .99, .105, .109, .112.

Also testifying during the hearing was Elizabeth D. Kent, the Air Force's procuring contracting officer. Of relevance is Ms. Kent's testimony concerning the temporal characteristics of the IR&D costs proposed [. . .] and the Air Force's changed understanding of the allowability

of IR&D costs.  With respect to the former topic, Ms. Kent testified that the Air Force always understood that neither the solicitation, nor the FAR, nor the CAS differentiated between past, present, and future IR&D costs, and that such a distinction would be irrelevant to its price realism analyses.  Id. at 76507, 76517-18.  With respect to the latter topic, Ms. Kent stated that Raytheon's response to EN RAY-K-016 and the Air Force's initial conversation with Mr. Trautwein from the DCMA informed the Air Force's understanding of the difference between explicit and implicit contract requirements as they related to the rules concerning the allowability of IR&D costs as an indirect charge.  Id. at 76504, 76506, 76536.  Indeed, the Air Force's understanding changed to conform to Raytheon's interpretation; the ENs that the Air Force had sent to Raytheon and Northrop no longer reflected its position on the allowability of IR&D costs related to implicit contract requirements.  Id. at 76538-39.  Moreover, Mr. Trautwein, after reviewing the contractors' price/cost proposals, advised the Air Force in late March 2014 that Raytheon's reduction for IR&D was a permissible cost reduction method.  Id. at 76499-501.

After the hearing, the participants filed posthearing briefs.  See, e.g., id. at 76656-710, 76738-50.  In its briefs, the Air Force argued that the hearing testimony supported its position that the protests should be denied on their merits.  Id. at 76669, 76750.  Notably, in regard to Northrop's IR&D-related supplemental protest ground, the Air Force argued:

> Once Northrop notified the Air Force it would not be using IR&D (after EN NG-K-011 and NG-CP-003), . . . the Air Force was under no continuing obligation to pressure Northrop to include IR&D in its proposal.  In fact, additional inquiries in this area may have inadvertently disclosed Raytheon [. . .].  Based on Northrop's responses, the Agency determined it must tailor further discussions to focus on Northrop's proposed cost reduction methodology [. . .] as identified in Northrop's EN response  . . . .

Id. at 76741 (footnote omitted).

Shortly after receiving the posthearing briefs, the GAO attorney assigned to the protests invited counsel for the parties to participate in an alternative dispute resolution outcome prediction conference.  Id. at 76751.  She advised:

> I have reached my resolution concerning the merits of the protest and have discussed this matter with my supervisors.  . . .  [W]e are currently working on a draft of the decision.
>
> As an alternative to the issuance of a decision, we are inquiring at this time as to whether the parties would like to participate in an alternative dispute resolution (ADR) outcome prediction session, or prefer to proceed to a written decision.

Our Office may provide outcome prediction . . . where we believe that the record is appropriate for a discussion of the merits of the protest. Outcome prediction is a presentation by the GAO attorney assigned to the protest discussing his or her views as to the merits of the protest, and how he or she would draft a written decision. This presentation is not, however, a formal adjudication by GAO of the merits of the protest, as . . . such a[n] adjudication only occurs in a formal written decision issued by the Office in the name of the General Counsel.

GAO does not and cannot impose binding arbitration in its outcome prediction; instead, the success of outcome prediction depends on voluntary action by the party who is advised that it is not likely to prevail. In order for outcome prediction to be a success, we ask that the agency commit to give serious consideration to taking corrective action in the event I advise that a sustain is likely, and [that the] protesters commit to give serious consideration to withdrawing the protest if I advise that a deny is likely.

Id. Although Northrop's counsel indicated a "strong preference" for a written decision, id. at 76761, counsel for Lockheed and the Air Force were amenable to participating in an outcome prediction conference, id. at 76759, 76764.[8]  Accordingly, the GAO attorney conducted the conference at noon on January 15, 2015, id. at 76719-34, fourteen days before the GAO's written decision was due, id. at 76751.

As reflected in handwritten notes taken by Air Force personnel during the outcome prediction conference, the GAO attorney advised the participants that she had reached a decision, that she had consulted with her supervisors, and that it was highly likely that her decision would be reflected in the GAO's published decision if such a decision were necessary.  Id. at 76719, 76728, 76732.  She then indicated that she would sustain the protests on only two grounds.  Id. at 76719-34.

First, she stated that the record reflected that Raytheon's CTE 1 was the [. . .] GaN HPA [. . .], not just the GaN HPA and [. . .], and that Raytheon's [. . .], as redesigned with the circulator [. . .], was never tested.  Id. at 76720 ("Record supports CTE is [. . .] and not just GaN HPA, which is un-tested as changed in [Raytheon's] proposal.  Untested & unevaluated as impact of change on performance."), 76723 ("CTE #1 is [. . .], not just GaN HPA and [. . .]."), 76726 ("Definition is to test in relevant enviro[nment] . . . . Names should be used consistently, clearly list CT vs CTE.  TRA report – CT if sys[tem] depends on an element. . . .  CTE in question is the [. . .], not just a portion . . . . [Raytheon] changed the [. . .] since last tested at TRL-6.  GaN & [. . .] is not the only portion of the CTE as defined in the TRA Report; they may be novel elements, but excludes the [. . .] in the [. . .].  Did not assess how change would affect

_____

[8]  Although the GAO attorney invited counsel for Raytheon to the outcome prediction conference, she indicated that the GAO would only consider the views of Northrop, Lockheed, and the Air Force in determining "whether to proceed with outcome prediction."  AR 76751.

overall performance."), 76729 ("[Air Force] erred in [Raytheon] TR/LRU untested [change] ([. . .]).  [Air Force] . . . did not test design [change is] unreasonable.  . . .  [. . .], not portion of [. . .]."), 76732 ("Untested design change that cannot be assessed @ TRL6.  Design change was to CTE.  . . .  CTE in question is [. . .], not limited to a portion of [. . .].  . . .  Remainder of [. . .] need to be part of the CTE.").  Accordingly, she opined that the Air Force erred in concluding that Raytheon's CTE 1 was at TRL 6.  Id. at 76720, 76733.

Second, the GAO attorney indicated that the record reflected that the Air Force changed its understanding regarding the allowability of future IR&D costs, but never advised Northrop of its changed understanding.  Id. at 76721 ("Testimony shows understanding changed at time [final proposal revisions] were submitted.  . . .  Failing to inform [Northrop] of change in future IR&D use."), 76725 ("Future [IR&D] was not allowable at the time of ENs.  The Agency reversed its decision after discussions with [Raytheon] concerning the use of future [IR&D] and failed to inform [Northrop] of its reversal."), 76727 ("[D]id not express Agenc[y's] revised understanding of IR&D.  . . .  [Air Force] reversed stance on allowability of IR&D after [Raytheon] response.  Failed to inform [Northrop.]"), 76730 ("[Air Force] failed to inform [Northrop] of change."), 76733 ("Never informed [Northrop] of reversal.").  She therefore opined that the Air Force's discussions with Northrop were misleading and unequal.  Id. at 76721, 76723, 76727, 76733.

In light of her anticipated resolution of the protests, the GAO attorney recommended that the Air Force re-evaluate the TRL of Raytheon's CTE 1 (reopening technical discussions with all three contractors if necessary), reopen cost/price discussions with all three contractors to explain its current view of the allowability of IR&D costs, and permit the submission of new final proposal revisions.  Id. at 76722, 76724-25, 76727, 76731, 76734.  She then requested that the Air Force respond to her recommendations by 3:00 p.m. on the following day.  Id. at 76722-23, 76725-26, 76728, 76732.

The Air Force complied with the GAO attorney's request.  See id. at 76735 (containing the Air Force's response); Mot. Strike Ex. 1 (reflecting that the Air Force responded to the GAO via electronic mail at 10:43 a.m. on January 16, 2015).  In a January 16, 2015 letter that was also provided to counsel for Raytheon, Northrop, and Lockheed via electronic mail, the Air Force advised the GAO attorney that it had decided to take corrective action:

In response to the Outcome Prediction session, and in accordance with guidance from your office, the Air Force has decided to take corrective action.  The Air Force intends to reopen discussions concerning the technical evaluation of Raytheon's Technology Readiness Level in accordance with Section M, Paragraph 2.4.1.3 of the [solicitation].  In addition, the Air Force intends to reopen discussions with all offerors to clarify the allowability of Independent Research and Development (IR&D) as it relates to the cost/price evaluation.  The Air Force reserves the right to take any other corrective action it deems appropriate.

AR 76735.  Given this proposed corrective action, the Air Force requested that the GAO dismiss Northrop's and Lockheed's protests as moot.  Id.  The GAO did so on January 21, 2015.  Id. at 76736-73.

## G.  The Current Protest

Two days later, Raytheon submitted to the court, pursuant to Appendix C of the Rules of the United States Court of Federal Claims ("RCFC"), a notice that it intended to file a protest challenging the need for, and scope of, the corrective action proposed by the Air Force.[9]  Mot. Strike Ex. 2 at 3.  That same morning, Raytheon provided the identical prefiling notice to counsel for the United States, the Air Force, Northrop, and Lockheed.  Id. at 1-4.  In its prefiling notice, Raytheon alleged that the Air Force proposed its corrective action "in response to a flawed Outcome Prediction announcement" by the GAO in connection with the protests lodged by Northrop and Lockheed.  Id. at 1.  Raytheon also indicated that it intended to file its protest on January 26, 2015.  Id. at 2.

As it represented in its prefiling notice, Raytheon filed a protest in this court on January 26, 2015, challenging the Air Force's decision to take corrective action in response to the outcome prediction statement made by the GAO attorney.  Compl. ¶ 1.  In its first claim for relief, Raytheon contends that the Air Force's decision to take corrective action with respect to the TRL of its CTE 1 was arbitrary, capricious, and unreasonable because the GAO's determination was unreasonable.  Id. ¶¶ 82-152.  It therefore requests that the court (1) declare that "the outcome prediction findings and recommendations of GAO, and the Air Force's decision to take corrective action in response, are irrational and contrary to law;" (2) declare that the contract it was awarded is valid; and (3) issue an injunction preventing the Air Force from taking the proposed corrective action or "otherwise interfering with Raytheon commencing performance" of the contract.  Id. at 40.  In the alternative, Raytheon requests that if the court determines that the independent review team's assessment of its CTE 1 was not sufficiently documented, that the court declare the Air Force's proposed corrective action to be arbitrary and capricious for being overly broad.  Id.

In its second claim for relief, Raytheon alleges that the Air Force's decision to take corrective action with respect to the allowability of IR&D costs was arbitrary, capricious, and unreasonable because the GAO's determination was unreasonable.  Id. ¶¶ 153-255.  It therefore requests that the court (1) declare that "the outcome prediction recommendation of GAO and the Air Force's decision to take corrective action in response to that recommendation are irrational and contrary to law;" (2) declare that the contract it was awarded is valid; and (3) issue an injunction preventing the Air Force from taking the proposed corrective action or "otherwise interfering with Raytheon commencing performance" of the contract.  Id. at 75.

---

[9]  The procedural history in this section is derived from the parties' filings.

Shortly after Raytheon filed its complaint, the court allowed Northrop and Lockheed to intervene as defendants.  After defendant filed the administrative record, Northrop moved to supplement the record with a declaration from one of its employees and Raytheon moved to strike a purportedly improper document from the record.  As the parties were briefing those two motions, they began to address the merits of Raytheon's bid protest in cross-motions for judgment on the administrative record.  All motions have been fully briefed and the court heard argument on April 29, 2015.

## II.  THE SCOPE OF THE COURT'S REVIEW

Underlying all of the parties' motions is a critical threshold issue:  What, precisely, is the scope of the court's review?

In this bid protest, Raytheon challenges the Air Force's decision to take corrective action.  The United States Court of Federal Claims ("Court of Federal Claims") possesses jurisdiction to entertain such a challenge.  28 U.S.C. § 1491(b)(1) (2012); Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1380-82 (Fed. Cir. 2012).  As in all bid protests, the court reviews a decision to take corrective action pursuant to the standards set forth in the Administrative Procedure Act ("APA"), see 28 U.S.C. § 1491(b)(4), and will set aside the decision if it is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law,'" Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004) (quoting 5 U.S.C. § 706(2)(A) (2012)).  Under this standard, the court may set aside the Air Force's decision to take corrective action if, as Raytheon alleges, the Air Force's decision lacked a rational basis or involved a violation of regulation or procedure.  See Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009).

Procurement officials "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process."  Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001) (internal quotation marks omitted).  Thus, when a protestor challenges the procuring agency's decision as irrational, the court's review is "highly deferential" to the agency's decision, Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000), and "[t]he court is not empowered to substitute its judgment for that of the agency," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).  "Accordingly, the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  Impresa, 238 F.3d at 1332-33 (citation and internal quotation marks omitted); accord Advanced Data Concepts, 216 F.3d at 1058 ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning and consideration of relevant factors.").  When a protestor claims that the procuring agency's decision violates a statute, regulation, or procedure, it must show that the violation was "clear and prejudicial." Impresa, 238 F.3d at 1333 (internal quotation marks omitted).

In determining "whether the contracting agency provided a coherent and reasonable explanation" of its decision, Impresa, 238 F.3d at 1332-33 (internal quotation marks omitted), a court may only consider the grounds for the decision articulated by the agency, Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168-69 (1962); SEC v. Chenery Corp., 332 U.S. 194, 196 (1947).  The court cannot "supply a reasoned basis for the agency's action that the agency itself has not given . . . ."  Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc., 419 U.S. 281, 285-86 (1974).  However, it can "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned."  Id. at 286.

The Air Force, in its January 16, 2015 notice of corrective action, articulated the following rationale for taking corrective action:  "In response to the Outcome Prediction session, and in accordance with guidance from [the GAO], the Air Force has decided to take corrective action."  AR 76735.  In other words, the Air Force expressly represented that the GAO's "guidance" during the outcome prediction conference was the basis for its decision to take corrective action.

In general, when a court considers the propriety of a procuring agency's decision to take corrective action recommended by the GAO, it reviews whether the GAO's recommendation was itself rational.  See Turner Constr. Co. v. United States, 645 F.3d 1377, 1383 (Fed. Cir. 2011) (stating that "an agency's decision to follow a GAO recommendation . . . lacks a rational basis if it implements a GAO recommendation that is itself irrational"); Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) ("[A] procurement agency's decision to follow the Comptroller General's recommendation, even though that recommendation differed from the contracting officer's initial decision, was proper unless the Comptroller General's decision itself was irrational."); CBY Design Builders v. United States, 105 Fed. Cl. 303, 339 (2012) ("When the relevant procurement official . . . decides to adopt the views of the GAO after a protest has been heard by that body, this agency decision is not considered inherently unreasonable (for departing from the agency's previous position) nor invulnerable (under the shield of GAO authority), but is instead measured by the rationality of the recommendation it follows.").  As the court explained in Systems Application & Technologies, Inc. v. United States, the GAO's recommendation need not be final or formal:

> [T]he court has a broad mandate to entertain bid protests and review government procurement decisions.  If a procuring agency takes an action that is challenged in this court, this court has the responsibility to examine the basis for the agency's action, regardless of what that basis might be.  In other words, when determining the propriety of a procuring agency's decision to take corrective action, the court may review the rationality of, as appropriate, the underlying formal GAO decision containing a recommendation that the agency take such action or the underlying informal suggestion by the GAO, or any other entity or individual, that such action might be proper.

100 Fed. Cl. 687, 713 (2011), aff'd, 691 F.3d at 1374.[10]  In other words, it makes no difference whether the GAO's recommendation was made in a written decision sustaining a protest, in an electronic-mail message addressing the merits of a protest, or during an outcome prediction conference.[11]  Indeed, the means by which the GAO recommends corrective action are irrelevant because the GAO's recommendations, in any form, are never binding on a procuring agency.  See 31 U.S.C. § 3554(b)(3) (2012) (indicating that a procuring agency must inform the GAO when it decides not to take the GAO's recommended corrective action); AR 76751 ("GAO does not and cannot impose binding arbitration in its outcome prediction; instead, the success of outcome prediction depends on voluntary action by the party who is advised that it is not likely to prevail.").  Accordingly, so long as a procuring agency indicates that its decision to take

---

[10]  The Federal Circuit affirmed the court's jurisdictional, standing, and ripeness rulings. Sys. Application & Techs., 691 F.3d at 1380-85.  The court's merits rulings were not appealed. Id. at 1380.

[11]  There appear to be three published decisions from this court that concern bid protests in which the protestor challenged corrective action proposed by the procuring agency in response to a GAO attorney's statements during an outcome prediction conference.  See Metro. Van & Storage, Inc. v. United States, 92 Fed. Cl. 232 (2010); Carahsoft Tech. Corp. v. United States, 86 Fed. Cl. 325 (2009); ManTech Telecomms. & Info. Sys. Corp. v. United States, 49 Fed. Cl. 57 (2001), aff'd per curiam, 30 F. App'x 995 (Fed. Cir. 2002).  In Metropolitan Van & Storage, the court concluded that contrary to the protestor's contentions, some of the protestor's allegations were mooted by the corrective action taken by the procuring agency in response to a GAO outcome prediction conference because the corrective action addressed the improprieties identified by the GAO.  92 Fed. Cl. at 241, 249-55.  In Carahsoft Technology, the protestor challenged the breadth of the corrective action taken by the procuring agency in response to the GAO's outcome prediction statement, requiring the court to analyze whether the corrective action was appropriately tailored to remedy the impropriety identified by the GAO.  86 Fed. Cl. at 344-46.  And in ManTech Telecommunications, the GAO recommended certain corrective action during an outcome prediction conference, but the procuring agency opted to propose different corrective action; in considering the protestor's challenge to the corrective action proposed by the agency, the court reviewed the purported improprieties to determine whether they would be remedied by the proposed corrective action.  86 Fed. Cl. at 62-63, 65-80.  In none of these cases did the protestor challenge the need for, or decision to take, corrective action. Rather, the protestors' focus was on whether the procuring agency's corrective action remedied the improprieties identified by the GAO during the outcome prediction conference.  Accord Consol. Eng'g Servs., Inc. v. United States, 64 Fed. Cl. 617, 627-28 (2005) (noting that one of the contentions raised by the protestor in arguing that the procuring agency did not conduct meaningful discussions was that the agency should have conducted broader discussions upon taking corrective action in response to a GAO outcome prediction conference).  Thus, the reviewing courts in those bid protests had no need to review whether the GAO's identification of improprieties was reasonable or rational.

corrective action was based on a recommendation by the GAO, the court may examine the rationality of the GAO's decision.

In short, to the extent that the Air Force's January 16, 2015 notice of corrective action contains the sole justification for the Air Force's decision to take corrective action, the court is entitled to review the rationality of the GAO's recommendation that formed the basis of the Air Force's decision.  Of course, as addressed below, the Air Force contends that another document that it included in the administrative record–a January 26, 2015 "Memorandum for Record"–provides its independent rationale for taking corrective action.  If the court concludes, over Raytheon's objections, that the memorandum is properly before the court, then the court would revise the scope of its review of the Air Force's decision to take corrective action accordingly.

## III.  THE ADMINISTRATIVE RECORD

In addition to determining which decision(s) should be the focus of its review, the court must determine what evidence it may examine to assess the propriety of those decisions.  There can be no dispute that in a bid protest, the focal point of the court's review of a procuring agency's decision is the administrative record.  Camp v. Pitts, 411 U.S. 138, 142 (1973) (per curiam); Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed. Cir. 2009).  An administrative record typically contains the materials developed and considered by an agency in making its decision.  See Camp, 411 U.S. at 142-43 (remarking that an agency's finding must be "sustainable on the administrative record made" by the agency at the time of its decision); Citizens to Preserve Overton Park, 401 U.S. at 420 (noting that the trial court's review of the decision of the head of the agency was "to be based on the full administrative record that was before the Secretary at the time he made his decision"); Smith v. United States, 114 Fed. Cl. 691, 694 (2014) ("The administrative record to be considered by a reviewing court shall include all the materials compiled by the agency before it made its decision."); CRAssociates, Inc. v. United States, 95 Fed. Cl. 357, 377 (2010) ("[A]n essential premise of [APA] review presupposes that the agency will establish its rationale at, or prior to, the time of its decision–not after."); Arch Chems., Inc. v. United States, 64 Fed. Cl. 380, 385 (2005) ("The administrative record is supposed to reflect the information available to the decision maker at the time the challenged decisions were made . . . ."); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 345, 349-50 (1997) ("[T]he primary focus of the court's review should be the materials that were before the agency when it made its final decision.").  The typical practice in bid protests is for the procuring agency to compile the relevant materials and certify that those materials constitute the record relating to the decision being challenged by the protestor; defendant then files those materials with the court as the administrative record.  See RCFC 52.1(a); RCFC App. C, ¶¶ 21-24; Fla. Power & Light Co. v. Lorion, 470 U.S. 729, 743-44 (1985) (explaining that a court reviews an agency's decision "based on the record the agency presents to the reviewing court" and that "[t]he APA specifically contemplates judicial review on the basis of the agency record compiled in the course of informal agency action"); Arch Chems., Inc., 64 Fed. Cl. at 385 (noting that the administrative record in a bid protest "is prepared by an agency after the decision has been made

in response to questions about the validity of the decision making process"). Here, both Northrop and Raytheon contend that the administrative record compiled by the Air Force and filed by defendant is not a complete and accurate collection of the materials relevant to the Air Force's decision to take corrective action.

### A. Northrop's Motion to Supplement the Administrative Record

Northrop asserts that it cannot fully respond to the allegations advanced by Raytheon in its complaint based on the existing administrative record. As Northrop explains, Raytheon alleges that the evidence in the record before the GAO reflected that Northrop was not prejudiced by the purportedly misleading discussions, and that the GAO attorney's implicit acceptance of that evidence as sufficient to demonstrate prejudice was improper. Northrop contends that although it made an adequate showing of prejudice before the GAO, it could have supplied the GAO with additional information describing the prejudice it suffered. Thus, noting that the court might conclude that its review would be aided by this additional information, Northrop moves to supplement the administrative record with a declaration from one of its employees. Both Raytheon and defendant oppose Northrop's motion.

In assessing the propriety of an agency's decision, a court may allow supplementation of the administrative record "only if the existing record is insufficient to permit meaningful review consistent with the APA." Axiom Res. Mgmt., 564 F.3d at 1381; accord id. at 1380 ("[S]upplementation of the record should be limited to cases in which the omission of extra-record evidence precludes effective judicial review." (internal quotation marks omitted)). Northrop argues that the information contained in the proffered declaration is necessary for meaningful judicial review, asserting that the Court of Federal Claims has repeatedly held that supplementation of the administrative record may be warranted when there is a dispute concerning the prejudice suffered by an unsuccessful offeror resulting from misleading discussions. However, in every decision cited by Northrop, the party seeking to supplement the administrative record with evidence of prejudice was the party protesting the procuring agency's decision. See Sims v. United States, 112 Fed. Cl. 808, 815 (2013) (permitting a protestor to supplement the administrative record with a declaration supporting her allegation of prejudice); State of N.C. Bus. Enters. Program v. United States, 110 Fed. Cl. 354, 365 (2013) (allowing a protestor to supplement the administrative record with the portion of an affidavit containing evidence of its competitive injury); East West, Inc. v. United States, 100 Fed. Cl. 53, 57-58 (2011) (explaining that a declaration containing evidence of the prejudice suffered by the protestor may be considered by the court as part of the court's record, not the administrative record); Hunt Bldg. Co. v. United States, 61 Fed. Cl. 243, 272 (2004) (permitting a protestor to supplement the administrative record with a declaration supporting its allegation of prejudice); Gentex Corp. v. United States, 58 Fed. Cl. 634, 649 (2003) (holding that supplementation of the administrative record with an affidavit containing a description of the prejudice suffered by the protestor was appropriate). Northrop is not the protestor in this bid protest. Consequently, the decisions relied upon by Northrop are inapposite.

In this bid protest, Raytheon challenges the decision of the Air Force to take corrective action, arguing that the decision was based on unreasonable findings and recommendations made by the GAO attorney during the outcome prediction conference.  As previously explained, to the extent that the Air Force's decision to take corrective action was based on the GAO attorney's outcome prediction statement, the court's task is to evaluate whether that statement was reasonable in light of the record submitted to the GAO.  See Turner Constr., 645 F.3d at 1383; Honeywell, 870 F.2d at 648; Sys. Application & Techs., 100 Fed. Cl. at 712-13.  Because the declaration proffered by Northrop was not in the record submitted to the GAO, it is irrelevant to the court's examination of the reasonableness of the GAO's attorney's statement.

Northrop seeks to avoid this result by arguing that it was impossible for it to provide the information contained in the proffered declaration to the GAO due to Raytheon's proposed redaction of material pursuant to the GAO protective order and the timing of Raytheon's prejudice arguments before the GAO.  But even if Northrop's representations are accurate and it was precluded from submitting additional information regarding prejudice to the GAO, it was not harmed by the omission of that information from the record before the GAO.  Indeed, as Northrop acknowledges, given that the GAO attorney advised that she would likely sustain Northrop's protest with respect to its allegation of misleading discussions, it appears that Northrop successfully established prejudice without the GAO considering the additional information.

In sum, supplementation of the administrative record with the declaration proffered by Northrop is not necessary for meaningful judicial review.  The court therefore denies Northrop's motion.

### B.  Raytheon's Motion to Strike

Unlike Northrop, Raytheon does not seek to supplement the administrative record with additional information.  Rather, Raytheon seeks to remove a document from the administrative record filed by defendant.  Specifically, Raytheon contends that a January 26, 2015 "Memorandum for Record" that purports to address the Air Force's decision to take corrective action does not belong in the administrative record because it was not prepared contemporaneously with the Air Force's decision to take corrective action, and therefore constitutes a post-hoc rationalization of the Air Force's decision.  Defendant, Northrop, and Lockheed all oppose Raytheon's motion.

### 1.  The Legal Basis for Raytheon's Motion to Strike

As a threshold matter, the court must address the contention of defendant, Northrop, and Lockheed that Raytheon did not identify an appropriate legal basis for its motion to strike.  All three opposing parties assert that motions to strike are governed by RCFC 12(f), and that the motion filed by Raytheon does not fall within that rule's parameters.  The court disagrees that Raytheon is invoking RCFC 12(f) with its motion.

RCFC 12(f) provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Only the following documents, whether filed by the original parties to the suit or by third parties, are considered to be pleadings: complaints, answers, replies to offsets or pleas of fraud contained in an answer, and replies to an answer. RCFC 7(a). An administrative record is not a pleading. Id.; see also Mathews v. Weber, 423 U.S. 261, 264 (1976) (noting that the court could "consider only the pleadings and administrative record"); Sherwin v. United States, 436 F.2d 992, 968 (Ct. Cl. 1971) (indicating that it reviewed "the pleadings, administrative record, and briefs"); Three S Consulting v. United States, 104 Fed. Cl. 510, 514 (2012) (stating that the facts were derived "from the pleadings and administrative record"). In fact, the rule that governs administrative records in this court–RCFC 52.1–is not contained in the title of the RCFC devoted to pleadings and motions, but is instead located in the title of the RCFC regarding trials. Thus, there can be no doubt that an administrative record is not a pleading, and that therefore an administrative record is not an appropriate target of an RCFC 12(f) motion to strike.

Raytheon, a sophisticated party represented by experienced counsel, must know that RCFC 12(f) cannot be invoked to strike a document from an administrative record.[12] Indeed, at no point in its motion does it mention RCFC 12(f). Instead, Raytheon framed its motion as an attempt to ensure that the administrative record was an accurate representation of the Air Force's decision-making process. As it explains in its reply brief, a motion to strike a document from the administrative record is the flip side of a motion to supplement the administrative record; the ultimate result sought by the proponents of both motions is an evidentiary record upon which a court can conduct an effective review of an agency's action.

Raytheon's characterization of its motion is consistent with the decision of the Federal Circuit in Axiom Resource Management. In that case, the Court of Federal Claims allowed the parties to freely supplement the administrative record with the understanding that it would only rely on the relevant supplementary material. 564 F.3d at 1379. The Federal Circuit rejected this approach, holding that the administrative record should be "supplemented only if the existing record is insufficient to permit meaningful review consistent with the APA." Id. at 1381. If the Court of Federal Claims is charged with ensuring that an administrative record is not supplemented with improper material, then it follows that the court is also responsible for ensuring that an administrative record does not itself contain improper material. See also Arch Chems., 64 Fed. Cl. at 385 ("Thus, the Court must focus on the timing of the decisions at issue to determine if the administrative record assembled by an agency needs to be supplemented or

---

[12] Defendant is also represented by experienced counsel–the United States Department of Justice. It therefore bears noting that notwithstanding the plain language of RCFC 12(f), defendant regularly moves to strike documents in bid protests that are not pleadings. See, e.g., Kvichak Marine Indus., Inc. v. United States, 118 Fed. Cl. 385, 387 (2014); Command Mgmt. Servs., Inc. v. United States, 111 Fed. Cl. 279, 285 (2013); CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 478 (2013); State of N.C. Bus. Enters. Program, 110 Fed. Cl. at 361.

pared back."); Cubic Applications, Inc. v. United States, 37 Fed. Cl. 339, 341, 343-44 (1997) (considering, and ultimately denying, the plaintiff's motion to "limit" the administrative record).

Raytheon's characterization of its motion also comports with the manner in which the Court of Federal Claims resolves the merits of a bid protest. Typically, the parties' substantive contentions regarding the merits of a bid protest are advanced in motions for judgment on the administrative record filed pursuant to RCFC 52.1(c). Because the court makes "factual findings . . . from the record evidence" in ruling on such motions, judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record." Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005). There can be no dispute that parties trying a case in the absence of an administrative record may move both for the admission of relevant evidence and for the exclusion of irrelevant or otherwise inappropriate evidence. See Fed. R. Evid. 402 (noting that relevant evidence is generally admissible and irrelevant evidence is not admissible); Fed. R. Evid. 403 ("The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."). The court discerns no reason why the parties trying a case on an administrative record should not be afforded the same opportunities. Therefore, it concludes that there is an adequate legal basis for Raytheon's motion to strike.

## 2. The Proper Standard for Reviewing Raytheon's Motion to Strike

Implicitly recognizing that there might be a legal basis for Raytheon's motion, defendant and Northrop contend that Raytheon did not recognize, or attempt to meet, its burden to establish that the document at issue should be stricken from the administrative record. Problematically, however, both defendant and Northrop rely on decisions addressing the standard for reviewing motions to strike under RCFC 12(f). See Cal. Indus. Facilities Res., Inc. v. United States, 104 Fed. Cl. 617, 618 (2012) (setting forth the standard for reviewing a motion to strike pursuant to RCFC 12(f) in a case where the defendant sought to strike an exhibit attached to a complaint); Waltner v. United States, 98 Fed. Cl. 737, 766-67 (2011) (setting forth the standard for reviewing a motion to strike pursuant to RCFC 12(f) in a case where the plaintiffs sought to strike information contained within, and exhibits attached to, the defendant's motion to dismiss); Fisherman's Harvest, Inc. v. United States, 74 Fed. Cl. 681, 689-90 (2006) (setting forth the standard for reviewing a motion to strike pursuant to RCFC 12(f) in a case where the plaintiffs sought to strike another party's motion); Impresa Construzioni Geom. Domenico Garufi v. United States, 61 Fed. Cl. 175, 177 (2004) (noting that the plaintiff's motion to strike a statement contained in one of the defendant's briefs was untimely under RCFC 12(f)), appeal voluntarily dismissed, 125 F. App'x 310 (Fed. Cir. 2005). These decisions, and the standards described therein, are therefore inapplicable to Raytheon's motion.

The proper standard of review for a motion to strike a document from an administrative record is the mirror image of the one that applies to motions to supplement the administrative record–the court will strike a document from an administrative record if its inclusion in the

record would preclude effective, meaningful judicial review.  See Axiom Res. Mgmt., 564 F.3d at 1380-81.  Given the importance of having a properly constituted administrative record to permit meaningful judicial review, common sense demands that the court use the same standard for motions to supplement the administrative record and motions to remove documents from the administrative record.  After all, merely because the government assembles the administrative record does not mean that the record is inviolate and not subject to the court's scrutiny.

In applying this standard to Raytheon's motion, the court does not ignore the presumption of regularity that attaches to the actions of government agencies.  See U.S. Postal Serv. v. Gregory, 534 U.S. 1, 10 (2001) (noting that "a presumption of regularity attaches to the actions of Government agencies"); Schism v. United States, 316 F.3d 1259, 1302 (Fed. Cir. 2002) (en banc) ("This presumption of regularity is the supposition that public officers perform their duties correctly, fairly, in good faith, and in accordance with law and governing regulations, and is valid and binding unless 'well-nigh irrefragable proof rebuts or overcomes it.'" (citation omitted) (quoting Alaska Airlines, Inc. v. Johnson, 8 F.3d 791, 795 (Fed. Cir. 1993))); Am-Pro Protective Agency, Inc. v. United States, 281 F.3d 1234, 1239 (Fed. Cir. 2002) (noting "the strong presumption that government contract officials exercise their duties in good faith").  Indeed, the court presumes that the Air Force compiled the administrative record correctly and in good faith.  This presumption, however, can be overcome if Raytheon can clearly demonstrate that the Air Force incorrectly included the document at issue in the administrative record.[13]

### 3. The Merits of Raytheon's Motion to Strike

Raytheon contends that the January 26, 2015 memorandum concerning the Air Force's decision to take corrective action should be removed from the administrative record because it was not prepared contemporaneously with the Air Force's decision to take corrective action and therefore constitutes a post-hoc rationalization of the Air Force's decision.  As reflected in the administrative record, the GAO attorney conducted the outcome prediction conference at noon on January 15, 2015.  The following day at 10:43 a.m., the Air Force sent a letter to the GAO indicating its intent to take corrective action.  On January 23, 2015, Raytheon submitted a notice to the court and the other parties of its intent to file a bid protest three days later to challenge the Air Force's decision to take corrective action.  Raytheon filed its protest on January 26, 2015, and on the same date, the Air Force issued a memorandum regarding its decision to take corrective action.[14]  Thus, the memorandum purporting to explain the reasons for the Air Force's decision to take corrective action was issued ten days after the Air Force indicated its intent to

---

[13]  A finding of bad faith is not required to overcome the presumption of regularity if one or more of the other elements of regularity is implicated.

[14]  The memorandum is dated January 26, 2015.  There is no evidence in the administrative record that the Air Force began to prepare the memorandum prior to January 26, 2015.  Moreover, defendant did not offer any evidence, such as a declaration from an Air Force official, indicating when the Air Force began to prepare the memorandum.

take corrective action.  From Raytheon's perspective, a ten-day delay is too long for the memorandum to be considered a contemporaneous justification for the Air Force's decision to take corrective action.

    As noted above, the Court of Federal Claims reviews a decision of a procuring agency based on the record that was before the agency at the time that it made its decision.  The court in Arch Chemicals explained this requirement in more detail:

> The administrative record is supposed to reflect the information available to the decision maker at the time the challenged decisions were made, as well as the rationale for why the agency acted as it did at the time that it did.  Thus, the Court must focus on the timing of the decisions at issue to determine if the administrative record assembled by an agency needs to be supplemented or pared back. . . .  Documents that pre-date or are contemporaneous with the relevant decisions may appropriately be a part of the Administrative Record.  Those created after-the-fact are suspect, as courts reviewing an administrative record recognize that they must reject "post hoc rationalizations" as a basis for the agency action.

64 Fed. Cl. at 385-86 (citations omitted).  The Air Force did not issue its memorandum justifying its decision to take corrective action until ten days after it indicated its intent to take corrective action and three days after it learned that Raytheon would be protesting its proposed corrective action.  Nevertheless, defendant, Northrop, and Lockheed contend that the memorandum was prepared contemporaneously with the Air Force's decision and should therefore be included in the administrative record.

    The contentions of the parties opposing Raytheon's motion can be summarized as follows:[15]  The Air Force prepared the January 26, 2015 memorandum to formally memorialize the information it acquired and considered in deciding to take corrective action.  The memorandum accordingly does not contain a post-hoc rationalization of the Air Force's decision.  The mere ten-day delay between the decision to take corrective action and the memorandum containing the justification for the decision does not render the memorandum untimely or otherwise improper.  In fact, there is no legal requirement that such a memorandum be completed prior to a procuring agency announcing its decision.  Further, the information in the memorandum is consistent with the remainder of the administrative record.  Moreover, because the Air Force did not prepare the memorandum while this litigation was pending, it could not have used the memorandum to invent a justification for its decision to take corrective action for the purposes of litigation.  In sum, there is no reason to suspect that the memorandum does not accurately reflect the rationale for the Air Force's decision.  Nevertheless, any concerns regarding

---

[15]  Each party did not necessarily advance each contention.  The court combined the parties' arguments for convenience.

-28-

the memorandum should be addressed by giving it the necessary weight, rather than by striking it from the administrative record.

The court does not find merit in these arguments.  First, a ten-day gap between a decision and the issuance of a document justifying the decision is more than a de minimis delay.  The Air Force presumably had a reason for deciding to take corrective action in advance of announcing its decision.  It should have been able to memorialize that rationale at the time the decision was reached, or immediately thereafter.

Second, by definition, a post-hoc rationale is any rationale that departs from the rationale provided at the time the procuring agency made its decision.  See CRAssociates, 95 Fed. Cl. at 377 (remarking that a post-hoc rationale can take the form of a new explanation for a decision or a previously undocumented rationale); see also id. at 376 n.15 (distinguishing between post-hoc rationalizations and "further explanations"); D & S Consultants, Inc. v. United States, 101 Fed. Cl. 23, 35-36 (2011) (same).  When the Air Force, in its January 16, 2015 letter, notified the GAO and the contractors that it intended to take corrective action, it provided:  "In response to the Outcome Prediction session, and in accordance with guidance from your office, the Air Force has decided to take corrective action."[16]  AR 76735.  In contrast, the Air Force provided the following justifications for taking corrective action in its January 26, 2015 memorandum:  (1) it "concede[d] that its documentation included references to the [TRLRU], which could create ambiguity as to the TRL assessment team's conclusions"; (2) it "concede[d] that after receiving Raytheon's response to the subject EN, it did not reply to Northrop Grumman reiterating the present legal treatment of IR&D"; (3) it wanted "to ensure [that] all offerors [had] a complete understanding of [its] actions"; and (4) it wanted "to provide more robust documentation supporting [its] decision" to award the contract to Raytheon.  Id. at 76714-16.  The justifications contained in the memorandum go beyond the rationale that the Air Force described in its earlier letter.  The most reasonable reading of the Air Force's January 16, 2015 letter is that the Air Force recognized that the GAO would sustain the protests lodged by Northrop and Lockheed and that, to avoid that result, it decided to take corrective action to address the GAO's concerns (regardless of whether it agreed with the GAO that the relevant protest grounds were valid[17]).

_____

[16]  Although this justification lacks detail, it is sufficient to convey the basis of the Air Force's decision.  See Camp, 411 U.S. at 143 ("[I]n the present case there was contemporaneous explanation of the agency decision.  The explanation may have been curt, but it surely indicated the determinative reason for the final action taken[.]  . . .  The validity of the [agency's] action must, therefore, stand or fall on the propriety of that finding, judged, of course, by the appropriate standard of review.").

[17]  The Air Force was entitled to take corrective action upon hearing the GAO attorney's outcome prediction statement, even after vigorously defending its position before the GAO.  See John Reiner & Co. v. United States, 325 F.2d 438, 442 (Ct. Cl. 1963) ("It would be entirely justifiable for the contracting officer to follow the general policy of acceding to the views of the [GAO] . . . even though he had another position on the particular issue of legality or propriety.").

However, in its January 26, 2015 memorandum, the Air Force expressly conceded the validity of the relevant protest grounds, posited that the contractors did not completely understand its actions, and asserted that the documentation of its award decision was not sufficiently robust. None of these reasons was contained in its original letter.[18]  Even if they were not new rationales from the Air Force's point of view, they certainly constituted previously undocumented rationales.

Third, while there may be no statute or regulation requiring an agency to document its reasons for taking corrective action at the time it makes its decision, both binding and nonbinding precedent indicate that a court should limit its review of an agency's decision to the materials that were before the agency when it made its decision. See Camp, 411 U.S. at 142-43; Citizens to Preserve Overton Park, 401 U.S. at 420; Smith, 114 Fed. Cl. at 694; CRAssociates, 95 Fed. Cl. at 377; Arch Chems., 64 Fed. Cl. at 385; Cubic Applications, 37 Fed. Cl. at 349-50.  It therefore follows that a procuring agency should document the reasons for its decision to take corrective action at the time that it makes the decision.

Finally, the fact that the Air Force issued its memorandum before Raytheon filed this bid protest does not preclude an inference that the Air Force prepared the memorandum for the purposes of this litigation.  The Air Force had more than enough time to finalize the memorandum before it received notice that Raytheon intended to file a bid protest in the Court of Federal Claims, but it did not do so until three days after it received that notice.  Raytheon's prefiling notice clearly indicated that Raytheon intended to protest the Air Force's proposed corrective action, and based on the extensive proceedings before the GAO and the GAO attorney's statement during the outcome prediction conference, the Air Force, Northrop, and Lockheed would have known the precise nature of Raytheon's protest.  Thus, it is not unreasonable to suspect that the memorandum was prepared in anticipation of litigation.

In sum, the court concludes that consideration of the Air Force's January 26, 2015 memorandum would not be conducive to meaningful, effective judicial review.  Accordingly, two courses of action are available to the court.  First, the court can strike the memorandum from the administrative record pursuant to its inherent authority to ensure that the administrative record is properly constituted.  Cf. Axiom Res. Mgmt., 564 F.3d at 1379-81 (rejecting the trial court's process of allowing a generous supplementation of the administrative record and then deciding after supplementation what materials were actually relevant to the bid protest).  Second, the court can leave the memorandum in the administrative record and assign it no weight.  See Citizens to Preserve Overton Park, 401 U.S. at 420 (allowing an agency to add newly prepared formal findings to a pre-existing administrative record, but noting that "[s]uch an explanation [would], to some extent, be a 'post hoc rationalization' and thus must be viewed critically");

---

[18]  Indeed, given how succinctly the Air Force's after-the-fact justifications for its decision to take corrective action can be summarized, it is baffling that the Air Force could not have included those justifications in its January 16, 2015 letter or in a separate document prepared that same day.

CRAssociates, 95 Fed. Cl. at 377 (remarking that there is no legal authority that "requires the court to give" a contracting officer's statement of facts submitted during a GAO protest "any independent, let alone dispositive, weight"); Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States, 56 Fed. Cl. 502, 508 (2003) ("The Supreme Court has made clear that post hoc rationalizations offered by the agency should be afforded limited importance in the court's analysis."); Cubic Applications, 37 Fed. Cl. at 343-44 (noting that the court had "a choice about the degree of relevance to assign to" postdecisional documents included in an administrative record). Based on the circumstances in this case, where the Air Force documented a justification for its decision to take corrective action ten days after it had made the decision and three days after learning that Raytheon intended to file this bid protest, the court will strike the memorandum from the administrative record. Raytheon's motion is therefore granted.

## IV. THE PARTIES' CROSS-MOTIONS FOR JUDGMENT ON THE ADMINISTRATIVE RECORD

Having disposed of the parties' procedural motions, the court shifts its attention to the parties' cross-motions for judgment on the administrative record, which address the merits of Raytheon's bid protest. As discussed above, because Raytheon challenges the Air Force's decision to take corrective action in response to the outcome prediction statement made by the GAO attorney, the court is tasked with reviewing whether the recommendations encompassed within the GAO attorney's statement were themselves rational. When reviewing the rationality of GAO recommendations that form the basis of the procuring agency's decision to take corrective action, the court examines the original actions of the procuring agency that were challenged at the GAO. See Turner Constr., 645 F.3d at 1383 ("Our task is to evaluate the rationality of the GAO decision. . . . When [the contracting officer's evaluation of bids] is reasonable, neither a court nor the GAO may substitute its judgment for that of the agency."). The court's examination is highly deferential to the procuring agency due to the broad discretion that government officials have in procurement matters. Id. If the court concludes that the challenged action was irrational for the reasons stated by the GAO, then it must find that the GAO's recommendation to take corrective action was rational. Id. Conversely, if the court concludes, contra the GAO, that the challenged action was rational, then it must find that the GAO's recommendation to take corrective action was irrational. Id. With this standard in mind, the court addresses Raytheon's allegations.

### A. The Technical Evaluation of Raytheon's Proposal

Raytheon first challenges the Air Force's decision to take corrective action with respect to the TRL of its CTE 1. The GAO attorney concluded that Raytheon's CTE 1 was the [. . .] GaN HPA [. . .], and not just the GaN HPA and [. . .], and that Raytheon's [. . .], as redesigned with the circulator [. . .], was never tested. She therefore opined that the Air Force erred in concluding that Raytheon's CTE 1 was at TRL 6. Raytheon contends that the GAO attorney's findings and conclusion were irrational, and that the Air Force properly assessed its CTE 1 as TRL 6.

## 1. Raytheon's Pre-EMD CTE 1

The administrative record reflects that during the pre-EMD period of the 3DELRR acquisition program, the independent review team identified Raytheon's GaN HPA [. . .] as a CTE. In its Technology Readiness Assessment report, the team described the GaN HPA [. . .] as a "[. . .]." On its face, this description is confusing because it purports to define the GaN HPA [. . .] as including a single T/R module and as constituting an entire TRLRU, which is [. . .]. However, for the purposes of this bid protest, whether it is more accurate to consider the GaN HPA [. . .] as a single T/R module or the entire TRLRU is unimportant, because the independent review team specified that its focus was not on the GaN HPA [. . .], but on what it considered to be the new and novel elements of the GaN HPA [. . .]: the GaN HPA and [. . .]. It concluded, upon reviewing the relevant test results, that both of the new and novel technologies included in the GaN HPA [. . .], as well as the GaN HPA [. . .] itself, were sufficiently mature to be assessed as TRL 6. In other words, they had been demonstrated in a relevant environment.

## 2. Raytheon's EMD Proposal

Raytheon did not rest on its laurels after the pre-EMD period concluded. Because the EMD solicitation reflected that price would play a key role in the Air Force's source selection decision, the contractors had a considerable incentive to propose the lowest price possible. Raytheon determined that it could propose a lower price by decreasing its cost to produce its radar system. To lower its production costs, Raytheon changed the design of its TRLRU, [. . .] with COTS circulators, and [. . .]. The only evidence of this design change in Raytheon's proposal for the EMD contract was in a figure depicting its TRLRU in which the [. . .] did not appear. Raytheon did not describe the change in the text of its proposal, nor did Raytheon submit any information concerning the effect that the change would have on the TRL of its CTE 1.

Raytheon first addressed the design change during discussions with the Air Force. In response to an EN related to its proposed production cost savings, Raytheon characterized the design change to the TRLRU as a "producibility improvement," and did not indicate any concern that the [. . .] COTS circulators or redesigned [. . .] would affect the TRL of its CTE 1. Upon reviewing Raytheon's response, the Air Force similarly did not express any concerns that the design change would affect the TRL 6 assessment for Raytheon's CTE 1, likely because its focus was on the two new and novel technologies previously identified by the independent review team–the GaN HPA and [. . .].

This lack of concern carried over into the Air Force's technical evaluation of Raytheon's final proposal revision. Although the independent review team and the Air Force's technical evaluators reviewed the figure depicting the [. . .] TRLRU,[19] they did not seek any information

_____

[19]   Contrary to Raytheon's contention, there is no evidence in the administrative record that the GAO attorney stated that the Air Force was unaware that Raytheon changed the design of its TRLRU. Indeed, such a statement is not reflected in the handwritten notes taken by the Air

from Raytheon concerning the effects that the design change might have on the performance of the TRLRU or the maturity of Raytheon's CTE 1. Instead, the Air Force determined that there were no changes to Raytheon's CTE 1 and that Raytheon had met the requirement set forth in section M of the solicitation that one of the CTEs be a GaN HPA-based T/R module.

### 3. The Air Force Did Not Comply With the Evaluation Scheme Set Forth in the Solicitation

Based on the contemporaneous evidence contained in the administrative record, it is readily apparent that despite the various labels used to denote Raytheon's CTE 1, the independent review team and the Air Force's technical evaluators focused their evaluation of the maturity of Raytheon's CTE 1 on the new and novel aspects of the GaN HPA [. . .]–the GaN HPA and [. . .]. Indeed, neither the members of the independent review team nor the Air Force's technical evaluators–the individuals with the relevant knowledge and expertise–expressed any concern that the introduction of COTS circulators or the [. . .] would affect the TRL of Raytheon's CTE 1.

Normally, a procuring agency's technical assessments, such as the ones made by the Air Force with respect to Raytheon's CTE 1, must be afforded the greatest possible deference. E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005) ("The evaluation of proposals for their technical excellence or quality is a process that often involves the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations."). Such deference would be especially appropriate in this case because the relevant guidance instructs that (1) CTEs are new or novel technologies, (2) technologies requiring nothing more than routine engineering development are not CTEs, (3) the evaluation of technical maturity must involve expert professional judgment, and (4) the design of a product may still be evolving through the end of the EMD phase. See TRA Deskbook 1-1; TRA Guidance 1-1, 2-5, 2-1; Interim DoDI 5000.02, § 5.d(9)(b)(1)(a), (9)(d). In light of the highly deferential standard applicable in these circumstances, the court has no difficulty concluding, based on the evidence in the administrative record, that the independent review team and the Air Force's technical evaluators reasonably assessed that the design change proposed by Raytheon would not affect the TRL of Raytheon's CTE 1. The members of the independent review team in particular possessed expertise in radar system design, hardware, software, testing, and signal processing, and it is eminently reasonable to conclude that they applied that expertise in determining that the use of COTS circulators and the redesign of the [. . .] would not affect the technical maturity of Raytheon's GaN HPA [. . .].

Problematically, however, the Air Force did not comply with the solicitation when it evaluated Raytheon's GaN HPA [. . .]. Pursuant to the solicitation, the contractors were required to substantiate a TRL 6 assessment for any CTEs that had changed since the conclusion of the pre-EMD period. Raytheon's CTE 1 was its GaN HPA [. . .], and not just portions of its GaN

_____

Force personnel participating in the outcome prediction conference–the only contemporaneous evidence of what the GAO attorney advised the parties.

HPA [. . .], such as the GaN HPA or [. . .]. Accordingly, Raytheon was required to substantiate that the changes it made to the design of its GaN HPA [. . .]–using COTS circulators and [. . .]–did not affect the TRL of the GaN HPA [. . .]. Raytheon did not do so. Thus, the Air Force's conclusion that Raytheon substantiated TRL 6 ratings for each of the CTEs that had changed since the pre-EMD period was erroneous. The Air Force should have required Raytheon to substantiate the TRL 6 rating of its changed CTE 1, and its failure to do so caused its assessment of Raytheon's CTE 1 to be in violation of the evaluation scheme set forth in the solicitation. The Air Force's evaluation of the technical maturity of Raytheon's CTE 1 was therefore arbitrary and capricious. See, e.g., CRAssociates, Inc. v. United States, 102 Fed. Cl. 698, 713 (2011) (noting that a procuring agency's departure from the evaluation scheme set forth in a solicitation can "lead to the award . . . being set aside as arbitrary, capricious or otherwise contrary to law"). Consequently, the GAO attorney's findings on this issue were rational, and the Air Force's reliance on her findings in deciding to take corrective action was also rational.

### 4. Raytheon's Arguments Lack Merit

In arguing against this result, Raytheon fails to distinguish between the substantive merits of the Air Force's technical evaluation and the need for the Air Force to comply with the evaluation scheme set forth in the solicitation. For example, Raytheon contends that the GAO attorney, in making her outcome prediction statement, confused two distinct evaluation criteria: the projected performance of its proposed radar system and the maturity of the critical technologies included in its proposed radar system. The distinction between performance and maturity is irrelevant, however. Even if the GAO attorney conflated the two concepts, she was still correct in noting that (1) Raytheon's CTE 1 was its GaN HPA [. . .], not just some [. . .] of its GaN HPA [. . .]; (2) Raytheon changed its GaN HPA [. . .] by introducing [. . .] circulators and [. . .]; (3) the Air Force directed the contractors to substantiate a TRL 6 assessment for any changed CTEs; (4) Raytheon did not submit any information substantiating that its changed GaN HPA [. . .] remained at TRL 6; and (5) the Air Force incorrectly determined that Raytheon did not change any of its CTEs and therefore satisfied the requirement that it substantiate TRL 6 ratings for each of the CTEs that had changed since the pre-EMD period.

Raytheon further argues that the GAO attorney substituted her judgment for that of the Air Force's technical evaluators. But again, the merits of the conclusions reached by the Air Force regarding the technical maturity of Raytheon's CTE 1 do not excuse the fact that the Air Force did not comply with the express terms of the solicitation in reaching those conclusions. The Air Force was required to evaluate proposals in accordance with the evaluation scheme it described in the solicitation. Thus, the GAO attorney's outcome prediction statement was rational.

Raytheon raises one additional issue regarding the Air Force's technical evaluation of its CTE 1 that is worth addressing: whether the Air Force's proposed corrective action is properly tailored to remedy the impropriety identified by the GAO. See Chapman Law Firm Co. v. Greenleaf Constr. Co., 490 F.3d 934, 938 (2007) (holding that it was proper for the Court of

Federal Claims to inquire into the reasonableness of the government's proposed corrective action and then determine that the proposed corrective action was reasonable); Sheridan Corp. v. United States, 95 Fed. Cl. 141, 151 (2010) ("[C]ontracting officers are provided 'broad discretion to take corrective action where the agency determines that such action is necessary to ensure fair and impartial competition.' Nevertheless, the chosen corrective action must be 'reasonable under the circumstances.' To be reasonable, the agency's corrective action must be rationally related to the defect to be corrected." (citations omitted)). In its complaint, Raytheon contends that if the court determines that the Air Force did not properly document the rationale underlying its conclusion that Raytheon's CTE 1 did not change after the pre-EMD period, then the Air Force's proposed corrective action–"reopen[ing] discussions concerning the technical evaluation of Raytheon's Technology Readiness Level in accordance with Section M, Paragraph 2.4.1.3 of the [solicitation]"–is overly broad, and therefore arbitrary and capricious.[20] However, as explained above, the problem with the Air Force's evaluation was not a lack of documentation. Rather, in limiting its technological maturity assessment of Raytheon's CTE 1 to just its new and novel elements, the Air Force did not evaluate Raytheon's proposal in accordance with the plain language of the solicitation, which required substantiation of a TRL 6 assessment for any changed CTEs. Raytheon changed its CTE 1, but did not provide the necessary substantiation. Therefore, the Air Force erred in concluding that Raytheon met the substantiation requirement. As such, the Air Force's proposed corrective action, which will allow Raytheon to provide the required substantiation, is a reasonable means by which to remedy the impropriety identified by the GAO attorney.

In sum, the Air Force did not evaluate Raytheon's technical proposal in accordance with the solicitation. The recommendation of the GAO attorney therefore had a rational basis, and it was rational for the Air Force to rely on the GAO attorney's recommendation in deciding to take corrective action. The court therefore denies Raytheon's protest on this ground.

### B. The Cost/Price Discussions

Raytheon next challenges the Air Force's decision to take corrective action with respect to the allowability of IR&D costs. The GAO attorney concluded that the Air Force changed its understanding regarding the allowability of future IR&D costs, but never advised Northrop of its changed understanding. She therefore opined that the Air Force's discussions with Northrop were misleading and unequal. Raytheon contends that the GAO attorney's findings and conclusion were irrational, and that the Air Force properly conducted discussions with respect to IR&D cost reductions.

---

[20] Raytheon does not pursue this contention in its motion for judgment on the administrative record.

### 1. Discussions Concerning IR&D Cost Reductions

The administrative record reflects that pursuant to the terms of the solicitation, the contractors were to identify and substantiate all reductions to their estimated costs to perform the EMD contract.  Permissible cost reductions included those attributed to management decisions and those attributed to commonality with other programs.  The latter category included cost reductions attributable to commonality with other programs, company-funded efforts, and capital equipment.  With respect to common programs, the contractors were required to explain how the associated costs were allowable and allocated pursuant to the FAR and their CAS Disclosure Statements.  With respect to company-funded efforts, the contractors were required to identify the efforts, the efforts' start and end dates, the applicability of the efforts to the EMD contract, the source of funding for the efforts, and their plans for allocating those costs in accordance with generally accepted accounting principles and their CAS Disclosure Statements.

In its initial proposal, Raytheon proposed [. . .] IR&D effort, and [. . .].  Lockheed [. . .] proposed [. . .].  And, Northrop initially proposed [. . .].  During the first round of discussions, the Air Force sent the contractors a number of ENs to obtain more information regarding their cost/price proposals.  For example, to assist in its cost realism analysis, the Air Force sent Raytheon and Northrop similar ENs that explained the Air Force's position with respect to the allowability of IR&D costs.  These ENs reflected the Air Force's understanding that pursuant to FAR 31.205-18 and 10 U.S.C. § 2320, IR&D costs were not "allowable as indirect charges for work implicitly required for performance (necessary to perform the contract) or explicitly required to be done by the terms of the contract."  In other words, the contractors would not be permitted to use IR&D costs to reduce their costs of performing the EMD contract if those costs were implicitly or explicitly required for contract performance.  At the same time that the Air Force sent these similar ENs to Raytheon and Northrop, it sent a separate EN to Northrop requesting information, such as "[. . .]/IR&D planning statements," to substantiate Northrop's plan to fund contract performance during three specified fiscal years.

In its response to the latter EN, Northrop stated that its performance of the EMD contract would not require the allocation of IR&D funding.  Consistent with this representation, Northrop's response to the former EN–the EN that was similar to the one sent to Raytheon–did not mention IR&D at all.  Raytheon, however, did mention IR&D in its EN response.  Specifically, it stated its disagreement with the Air Force's position on the allowability of IR&D costs, asserting that the Federal Circuit had held in <u>ATK Thiokol, Inc.</u> that all IR&D costs were allowable unless they were for work explicitly required by the contract.  It further asserted that it was in full compliance with the applicable rules regarding the allowability of IR&D costs.

After this first round of discussions, the Air Force investigated the rules pertaining to the allowability of IR&D costs and determined that Raytheon's statement was accurate.  It therefore changed its position and concluded that IR&D costs for work implicitly required for contract performance were allowable as indirect charges.  Although it did not expressly advise Raytheon of its agreement with Raytheon's response, the Air Force conducted no further discussions with

Raytheon concerning the allowability of IR&D costs, implicitly signaling its change of position. [. . .]  Northrop, however, received no such signals from the Air Force.  Indeed, the Air Force never advised Northrop that the statement it made in its EN regarding the allowability of IR&D costs for work implicitly required for contract performance was no longer an accurate representation of its position.  Thus, as far as Northrop was aware, the Air Force would not accept IR&D cost reductions for work implicitly required for contract performance.

Ultimately, only Raytheon [. . .] proposed IR&D cost reductions [. . .].

### 2.  Standards for Conducting Discussions

Northrop contends that the Air Force engaged in misleading and unequal discussions when it failed to advise Northrop that it had changed its position with respect to the allowability of IR&D costs.  As set forth in the FAR, discussions "are undertaken with the intent of allowing the offeror to revise its proposal," FAR 15.306(d), with the "primary objective of . . . maximiz[ing] the Government's ability to obtain best value," FAR 15.306(d)(2).  To meet this objective, procuring agencies are "encouraged to discuss . . . aspects of the offeror's proposal that could . . . be altered or explained to enhance materially the proposal's potential for award," but are "not required to discuss every area where the proposal could be improved."  FAR 15.306(d)(3).  Indeed, "[t]he scope and extent of discussions" are matters within the procuring agency's discretion.  Id.

Such discretion, however, does not permit a procuring agency to conduct misleading or unequal discussions.  Discussions are misleading when a procuring agency issues "incorrect, confusing or ambiguous" communications that misdirect an offeror attempting to revise its proposal.  DMS All-Star Joint Venture v. United States, 90 Fed. Cl. 653, 670 (2010); accord Analytical & Research Tech. v. United States, 39 Fed. Cl. 34, 48 (1997) ("'An agency may not inadvertently mislead an offeror, through the framing of a discussion question, into responding in a manner that does not address . . . the government's requirements.'" (quoting SRS Techs., B-254425 et al., 94-2 CPD ¶ 125 (Comp. Gen. Sept. 14, 1994)).  A procuring agency also misleads an offeror when the agency "knows that an offeror's interpretation of the [solicitation] is contrary, in a material way, to its own interpretation and that of a successful offeror," but fails to advise the offeror of that fact.  Gentex Corp., 58 Fed. Cl. at 653.  Discussions are unequal when a procuring agency favors "one offeror over another."  FAR 15.306(e)(1).  Consequently, although contracting officers should tailor discussions to each offeror's proposal, FAR 15.306(d)(1), they should not "inform some offerors of a concern . . . while staying silent with respect to identical issues in other offerors' proposals," Ashbritt, Inc. v. United States, 87 Fed. Cl. 344, 372 (2009).

### 3.  The Air Force's Discussions With Northrop Regarding the Allowability of IR&D Costs Were Misleading and Unequal

Raytheon contends that discussions regarding the allowability of IR&D costs were neither misleading nor unequal, and there is support in the administrative record for its position.  During

the first round of discussions, Northrop unambiguously disclaimed any reliance on IR&D cost reductions in response to one EN, and at the same time raised no objections to the Air Force's statements regarding the allowability of IR&D costs in response to a separate EN. As a result, when the Air Force decided not to pursue further discussions with Northrop regarding IR&D costs, there is a nonfrivolous argument to be made that the Air Force was merely tailoring its discussions to Northrop's proposal pursuant to FAR 15.306(d)(1).

Nevertheless, the evidence in the administrative record weighs more heavily in favor of Northrop's contention that the discussions were misleading and unequal. After the Air Force received the contractors' responses to the initial set of ENs, it determined that a statement it had communicated to Raytheon and Northrop regarding the allowability of IR&D costs no longer accurately represented its position. By not lodging any further objections to Raytheon's [. . .] proposed IR&D cost reductions, the Air Force signaled [. . .] that it was permissible to propose such reductions. However, the Air Force never advised Northrop of its changed understanding of the allowability of IR&D costs. Through its silence, the Air Force misled Northrop into believing that it would not accept IR&D cost reductions. Moreover, by advising only Raytheon [. . .] that it would accept IR&D cost reductions notwithstanding the language of its ENs, the Air Force engaged in unequal discussions with the contractors. At bottom, it was the Air Force's duty to ensure that all three contractors were competing on a level playing field. See, e.g., Joseph L. DeClerk & Assocs., Inc. v. United States, 26 Cl. Ct. 35, 46 (1992), cited in Sys. Application & Techs., 691 F.3d at 1383; see also FAR 1.102-2(c)(3) (requiring procuring agencies to treat all prospective contractors "fairly and impartially"). By misleading Northrop regarding its position on the allowability of IR&D costs and advising only Raytheon [. . .] that it had changed its position, the Air Force violated that duty. Consequently, the GAO attorney's conclusion that the Air Force engaged in misleading and unequal discussions concerning the allowability of IR&D costs was rational, and the Air Force's reliance on her conclusion in deciding to take corrective action was also rational.

#### 4. Raytheon's Arguments Are Not Persuasive

None of Raytheon's arguments to the contrary persuade the court to alter its conclusion. Raytheon first contends that the Air Force did not change the underlying rules of the procurement during discussions; IR&D costs were equally allowable under the solicitation and the FAR before discussions as they were under the solicitation and the FAR after discussions. Raytheon's contention, while accurate, is irrelevant. Although the rules regarding the allowability of IR&D costs remained unchanged throughout the procurement, the Air Force provided the contractors with different information regarding its understanding of those rules. In doing so, the Air Force engaged in misleading and unequal discussions.

Raytheon further argues that Northrop advanced inconsistent and shifting arguments before the GAO regarding its views on the allowability of IR&D costs in general, and the allowability of past, present, and future IR&D costs more specifically. Once again, these contentions are irrelevant. As noted above, in assessing whether the Air Force's decision to take

corrective action by reopening cost/price discussions was proper, the court must determine whether the Air Force's discussions pertaining to IR&D costs were misleading and unequal in the first instance. Northrop's representations to the GAO have no bearing on the court's inquiry in these circumstances.

Next, Raytheon asserts that ENs RAY-K-016 and NG-K-011 contained a misstatement of law regarding the allowability of IR&D costs, and that such a misstatement cannot constitute misleading or unequal discussions. In support of its argument, it cites several decisions in which the court ruled that a misrepresentation of law could not, absent unusual circumstances, form the basis for rescinding or reforming a contract. See Mills v. United States, 410 F.2d 1255, 1257 (Ct. Cl. 1969); Edwards v. United States, 19 Cl. Ct. 663, 671-73 (1990); C & L Constr. Co. v. United States, 6 Cl. Ct. 791, 798 (1984). None of these decisions arises from a bid protest, and therefore have little relevance here. The court is instead guided by the FAR, and the FAR lacks any misstatement-of-law exception to the requirement that procuring agencies conduct fair and equal discussions with offerors.

Relatedly, Raytheon contends that as an experienced government contractor, Northrop should have known what the law permitted with respect to the allowability of IR&D costs and therefore should not benefit from its own misunderstanding of the law. However, Northrop's understanding of the relevant law is of no moment when analyzing whether the Air Force conducted misleading or unequal discussions. The Air Force sent Northrop an EN containing its understanding of the allowability of IR&D costs but then changed its understanding without advising Northrop that it had done so. The fact that Northrop agreed with the Air Force's original understanding of the allowability of IR&D costs does not change the misleading and unequal nature of the discussions.

Raytheon's final two arguments concern the findings of the GAO attorney. Specifically, Raytheon contends that the GAO attorney's conclusion that the Air Force conducted misleading and unequal discussions was irrational because she should have dismissed Northrop's contentions as untimely and because she should have found that Northrop did not establish that it was prejudiced by the purportedly improper discussions. Neither argument has merit.

As Raytheon correctly notes, "except under limited circumstances, the GAO may not entertain untimely protests because they are not filed in accordance with the governing statutes" and regulations. Sys. Application & Techs., 100 Fed. Cl. at 713 (referring to 31 U.S.C. § 3552(a), 31 U.S.C. § 3555(a), 4 C.F.R. § 21.5(e), and 4 C.F.R. § 21.2(c)). And, "[w]hen the GAO acts in violation of the law, the act lacks a rational basis." Id. at 714. However, the evidence in the administrative record is unequivocal that Northrop had no basis for a claim of misleading and unequal discussions until after it received the agency report on November 26, 2014, reflecting that the Air Force had changed its position with respect to the allowability of IR&D costs during discussions, and that Northrop raised that claim in a supplemental protest on December 8, 2014, within the ten-day time limit set forth in the GAO's bid protest regulations. See 4 C.F.R. § 21.2(a)(2) (2014). Nevertheless, Raytheon asserts that Northrop should have

lodged its protest before the deadline for submitting final proposal revisions because two of the ENs that Northrop received from the Air Force during the initial round of discussions–EN NG-CP-003 and EN NG-K-011–were, when read together, patently ambiguous.  Raytheon contends that had Northrop challenged the purported patent ambiguity when it received the ENs, then the Air Force would have been forced to examine its position on the allowability of IR&D costs, foreclosing the possibility of a later claim for misleading and unequal discussions.  However, as counsel for Northrop explained during oral argument, the two ENs can be read harmoniously. See Oral Arg. Tr. 141:23-144:18, Apr. 29, 2015.  Specifically, in EN NG-CP-003, the Air Force merely requested that Northrop support its funding decisions; it did not indicate that it would have accepted IR&D costs as a means of funding contract performance had Northrop proposed to do so.  Indeed, the Air Force explained in EN NG-K-011 that certain types of IR&D costs were unallowable.  Thus, the two ENs are not, when read together, patently ambiguous.  Accordingly, when the GAO attorney implicitly concluded that Northrop timely raised the issue of misleading and unequal discussions by reaching the merits of its protest, she had a rational basis for that conclusion.

By reaching the merits of Northrop's protest, the GAO attorney also implicitly concluded that Northrop had established that it was prejudiced by the Air Force's misleading and unequal discussions.  It is well settled that before a protestor can prevail on a claim that there was "a significant error in the procurement process," it must show "that the error prejudiced it."  Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996); see also Bannum, Inc., 404 F.3d at 1351 (holding that if the procuring agency's decision lacked a rational basis or was made in violation of the applicable statutes, regulations, or procedures, the court must then "determine, as a factual matter, if the bid protester was prejudiced by that conduct").  "To establish prejudice . . . , a protester must show that there was a 'substantial chance' it would have received the contract award absent the alleged error."  Banknote Corp. of Am., 365 F.3d at 1350 (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)); see also Data Gen. Corp., 78 F.3d at 1562 ("[T]o establish prejudice, a protester must show that, had it not been for the alleged error in the procurement process, there was a reasonable likelihood that the protester would have been awarded the contract.").  The protestor is not required to demonstrate that but for the alleged error, it would have received the contract.  Bannum, Inc., 404 F.3d at 1358.

The evidence in the record before the GAO reflected the following facts:  (1) all three contractors received Acceptable technical compliance and technical risk ratings; (2) the difference between Northrop's final proposed price of [. . .] and Raytheon's final proposed price of [. . .] was [. . .]; (3) Raytheon proposed IR&D cost reductions of [. . .]; and (4) Northrop is a large government contractor with extensive financial resources.  Based on these facts, it was entirely reasonable for the GAO attorney to surmise that Northrop possessed the financial means to propose IR&D cost reductions [. . .], making it possible for Northrop to overcome the [. . .] differential in proposed prices.  Thus, the GAO's implicit conclusion that Northrop had a substantial chance of receiving the contract in the absence of the Air Force's misleading and unequal discussions was rational.

In sum, the Air Force conducted misleading and unequal discussions with respect to the allowability of IR&D costs.  The recommendation of the GAO attorney therefore had a rational basis, and it was rational for the Air Force to rely on the GAO attorney's recommendation in deciding to take corrective action.  The court therefore denies Raytheon's protest on this ground.

## V.  CONCLUSION

Although the court is ruling against Raytheon, Raytheon's bid protest is far from frivolous.  The evidence in the administrative record supports the Air Force's original conclusion, based on the expertise of the independent review team and its technical evaluators, that the design changes proposed by Raytheon would not have affected the TRL 6 assessment of Raytheon's CTE 1 because the new and novel aspects of Raytheon's CTE 1 were unchanged.  However, pursuant to the plain language of the solicitation, the Air Force should have ensured that Raytheon's CTE 1 as a whole remained at TRL 6 by requiring Raytheon to substantiate the TRL 6 assessment.  And, the evidence in the administrative record also reflects that Northrop made a strategic decision, based on its understanding of the relevant statutes, regulations, and guidance, not to rely on IR&D cost reductions to lower its proposed price.  However, the Air Force rendered that strategic decision irrelevant when it failed to advise Northrop of its changed position regarding the allowability of IR&D costs.  The Air Force's errors prevented a fair and equal competition, and the Air Force was therefore entitled, based on the GAO attorney's outcome prediction statement, to propose corrective action to remedy those errors.

Accordingly, for the reasons set forth above, the court **DENIES** Northrop's motion to supplement the administrative record, **GRANTS** Raytheon's motion to strike, **DENIES** Raytheon's motion for judgment on the administrative record, and **GRANTS** the remaining cross-motions for judgment on the administrative record.  No costs.  The clerk shall enter judgment accordingly.

The court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, by **no later than Friday, May 29, 2015**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

Also, as the parties are aware, they are required to file redacted versions of all documents that they filed under seal under paragraph 12 of the January 29, 2015 protective order.  The

parties shall continue to comply with this requirement until they have filed redacted versions of all sealed documents.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge