# In the United States Court of Federal Claims

No. 15-77C
(Filed Under Seal: June 5, 2015)
(Reissued: June 18, 2015)[*]

```
*************************************
RAYTHEON COMPANY,               *
                                *
            Plaintiff,          *
                                *
 v.                             *
                                *
THE UNITED STATES,              *
                                *
            Defendant,          *
                                *
and                             *
                                *
LOCKHEED MARTIN CORPORATION     *
and NORTHROP GRUMMAN SYSTEMS    *
CORPORATION,                    *
                                *
            Defendant-Intervenors.  *
*************************************
```

## OPINION AND ORDER ON PLAINTIFF'S RCFC 62(c) MOTION

In this bid protest, plaintiff Raytheon Company ("Raytheon"), the contract awardee, challenges the decision of the United States Air Force ("Air Force") to take corrective action based on the statements made by a Government Accountability Office ("GAO") attorney during an outcome prediction conference held in conjunction with protests lodged by defendant-intervenors Lockheed Martin Corporation ("Lockheed") and Northrop Grumman Systems Corporation ("Northrop"). In a May 11, 2015 Opinion and Order, the court denied Raytheon's motion for judgment on the administrative record and granted the remaining parties' cross-motions for judgment on the administrative record, allowing the Air Force to proceed with its proposed corrective action. Presently before the court is Raytheon's motion for a stay of the court's judgment and to enjoin the Air Force from proceeding with its proposed corrective action or awarding a new contract pending appeal. For the reasons set forth below, the court denies Raytheon's motion.

---

[*] This reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties on June 17, 2015. The redactions are indicated with bracketed ellipses ("[. . .]").

## I. BACKGROUND

Several years ago, the Air Force initiated the Three-Dimensional Expeditionary Long-Range Radar ("3DELRR") acquisition program to replace its existing AN/TPS-75 radar system.[1] Slip op. 2.  During the current phase of the procurement–Engineering and Manufacturing Development ("EMD")–Raytheon, Lockheed, and Northrop submitted proposals to further develop, build, and test a radar system.  Id. at 5.  The Air Force determined that all of the proposals were technically acceptable and ultimately awarded the EMD contract to Raytheon.  Id. at 14.  In postaward debriefings, the Air Force disclosed the price of the contract it awarded to Raytheon to Lockheed and Northrop.  Id. at 15.

Both Lockheed and Northrop protested the Air Force's award decision at the GAO.  Id. After extensive proceedings, id. at 15-18, the GAO attorney assigned to the protest held an alternative dispute resolution outcome prediction conference with the parties, id. at 19.  During the conference, the GAO attorney advised the parties that she anticipated sustaining the protests on two grounds:  (1) the Air Force erred in its technical evaluation of Raytheon's proposal and (2) the Air Force conducted unequal and misleading discussions regarding the parties' cost/price proposals.  Id. at 19-20.  She therefore recommended that the Air Force take corrective action to cure the defects that she identified.  Id. at 20.  The following day, the Air Force indicated that based on the GAO attorney's statements during the outcome prediction conference, it would take corrective action to cure the identified defects.  Id.  As a result, the GAO dismissed the protests lodged by Lockheed and Northrop as moot.  Id.

Shortly thereafter, on January 26, 2015, Raytheon filed the current bid protest, arguing that the Air Force's decision to take corrective action was arbitrary, capricious, and unreasonable because the GAO attorney's determinations were themselves unreasonable.  Id. at 21.  The parties fully briefed cross-motions for judgment on the administrative record and the court heard argument.  Id. at 21-22.  Ultimately, in its May 11, 2015 Opinion and Order, the court concluded that the GAO attorney's determinations were reasonable and that the Air Force's decision to take corrective action based on those determinations was therefore rational.  Id. at 34-44. Consequently, it denied Raytheon's protest.  Id. at 44-45.  The clerk entered judgment on May 13, 2015.

The following day, Raytheon filed a notice of appeal.  It also filed a motion seeking to stay the court's judgment and enjoin the Air Force from either proceeding with its proposed corrective action or awarding a new contract pending appeal.  The parties have fully briefed

---

[1]  With one exception, the court derives the facts in this decision from its May 11, 2015 Opinion and Order ("Slip op."), which contains a full recitation of the pertinent factual and procedural history.  The remaining fact is a quotation from the solicitation that appears in the administrative record ("AR"); the court paraphrased this quotation in its May 11, 2015 Opinion and Order.

Raytheon's motion pursuant to an expedited briefing schedule set by the court.  The court deems oral argument unnecessary.

## II.  DISCUSSION

Raytheon moves to stay the court's judgment and enjoin the Air Force from proceeding with its proposed corrective action pending appeal pursuant to Rule 62(c) of the Rules of the United States Court of Federal Claims ("RCFC"), which provides:  "While an appeal is pending from an interlocutory order or final judgment that grants, dissolves, or denies an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights."  In entertaining a motion under RCFC 62(c), the court considers four factors:  (1) whether the moving party has made a strong showing that it is likely to succeed on the merits; (2) whether the moving party will be irreparably injured absent the requested relief; (3) whether requested relief will substantially injure the other parties interested in the proceeding; and (4) the public interest.  Hilton v. Braunskill, 481 U.S. 770, 776 (1987); Standard Havens Prods., Inc. v. Gencor Indus., Inc., 897 F.2d 511, 512 (Fed. Cir. 1990); Alaska Cent. Express, Inc. v. United States, 51 Fed. Cl. 227, 229 (2001).  The court need not assign each factor equal weight.  Standard Havens Prods., 897 F.2d at 512.  Consequently, relief is appropriate where the moving party "'establishes that it has a strong likelihood of success on appeal, or where, failing that, it can nonetheless demonstrate a substantial case on the merits,' provided the other factors militate in [its] favor."  Id. at 513 (quoting Hilton, 481 U.S. at 778).  And, when the equitable factors weigh decidedly in the moving party's favor, "'it will ordinarily be enough that the [moving party] has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation . . . .'"  Id. (quoting Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 740 (2d Cir. 1953)); accord Alaska Cent. Express, 51 Fed. Cl. at 230 ("[I]f the equities weigh heavily in favor of maintaining the status quo, this court may grant an injunction under RCFC 62(c) where the question raised is novel or close, especially when the case will be returned to the trial court should the movant succeed.").

### A.  Likelihood of Success on the Merits

Raytheon first contends that it is likely to succeed on the merits of its appeal, asserting that the court erred by upholding the Air Force's decision to take corrective action with respect to both the technical evaluation of Raytheon's proposal and the cost/price discussions.  The court begins by addressing the technical evaluation issue.

### 1.  The Technical Evaluation of Raytheon's Proposal

#### a.  Factual Background

During an earlier phase of the 3DELRR procurement, a team of independent subject-matter experts ("independent review team") with expertise in radar system design, hardware,

software, testing, and signal processing prepared a Technology Readiness Assessment report for each offeror's proposed radar system.  Slip op. 2-3.  In those reports, the independent review team identified the radar systems' critical technology elements ("CTEs") and assigned each CTE a Technology Readiness Level ("TRL").  Id. at 2.  Raytheon's CTE 1 was its Gallium Nitride High Power Amplifier [. . .] ("GaN HPA [. . .]"), a [. . .] its proposed radar system's [. . .] subsystem.  Id. at 3-4.  However, notwithstanding its initial description of Raytheon's CTE 1 as the GaN HPA [. . .], the independent review team considered two components of the [. . .]–the GaN HPA and [. . .]–as the new and novel critical technologies that required TRL assessment.  Id. at 4-5.

In the solicitation for the current phase of the 3DELRR procurement, the Air Force described the proposal requirements and its evaluation criteria.  Id. at 5-7.  In paragraph 5.3.1.3 of section L of the solicitation, the Air Force indicated that offerors were to provide the following information in their technical proposals:  "The Offeror shall identify all critical technology elements (CTEs) of the design solution that have changed since [the pre-EMD phase of the procurement] . . . .  For each modified/new CTE identified, provide the current TRL, the source of the rating, and full substantiation with supporting data."  AR 41250; accord Slip op. 5.  Pursuant to paragraph 2.4.1.3 of section M of the solicitation, the Air Force would evaluate whether the technical proposals met the stated requirements "based on," in part:  "Substantiation of at least a Technology Readiness Level 6 (TRL 6) for all Critical Technology Elements (CTEs) of the design solution that have changed since the Pre-EMD Preliminary Design Review (PDR).  One CTE must be a Gallium Nitride (GaN) High Power Amplifier (HPA)-based Transmit/Receive (T/R) module."  Slip op. 7.

In its technical proposal, Raytheon did not describe any significant changes to its [. . .] subsystem, and expressly represented that since the pre-EMD period, it had not introduced any "new technologies" to its "design solution."  Id. at 7-8.  Raytheon further represented that its CTEs had not changed and that its radar system prototype "successfully demonstrated all Pre-EMD phase CTEs at TRL 6 and the overall design maturity in a relevant environment."  Id. at 8.  However, Raytheon did change the design of its CTE 1 by [. . .].  Id.  Raytheon acknowledged this change during discussions in its response to an Evaluation Notice ("EN") issued by the Air Force in which the Air Force requested information regarding Raytheon's proposed production cost savings.  Id. at 9.  Specifically, Raytheon noted:

[. . .]

Id.  The Air Force reviewed this response and ultimately deemed the discussion issue resolved.  Id.

When evaluating the offerors' final proposal revisions, the Air Force's technical evaluators reviewed Raytheon's proposal for compliance with the solicitation's technical requirements.  Id. at 13.  These technical evaluators were advised by four members of the original independent review team.  Id.  With respect to the requirement that the offerors substantiate TRL

6 ratings for each of the CTEs that had changed since the pre-EMD period, Kevin Ray, the chief evaluator for the relevant technical subfactor, remarked:

> Raytheon substantiated all criteria listed in Section M 2.4.1.3.
>
> The Technology Readiness Assessment (TRA) Independent Review Team (IRT) assessed all Raytheon's Critical Technology Elements (CTEs) at Technology Readiness Level 6 (TRL 6) during the Pre-Engineering and Manufacturing Development (Pre-EMD) Period of the Technology Development (TD) Phase.  Raytheon listed the same CTEs in the EMD proposal as those identified in the Pre-EMD Period.  In addition, Raytheon identified one CTE as a Gallium Nitride (GaN) High Power Amplifier (HPA)-based Transmit/Receive (T/R) module which met the Government's requirement.
>
> TRA IRT members reviewed and analyzed Volume II, Paragraph 1.3, Pages II-86 to II-88.  The IRT members confirmed the CTEs listed were the original CTEs approved by the team in 2013 and there were no changes to the CTEs since the Pre-EMD Period Preliminary Design Review (PDR) where Raytheon was assessed at TRL 6.  Raytheon described each CTE in the following Volume II pages.
>
> > 1. Pages II-19 to II-21 and the classified Volume IIA, Figure IIA-1.0.1-6 System Architecture for the T/R Line Replaceable Unit (LRU) and the receive LRU.

Id. at 13-14.

In its protest before the GAO, Lockheed challenged the Air Force's technical evaluation of Raytheon's CTE 1, arguing that because Raytheon's proposed GaN HPA [. . .] was different from the GaN HPA [. . .] it demonstrated during the pre-EMD period, the Air Force improperly considered Raytheon's CTE 1 to be assessed at TRL 6.  Id. at 16.  During a hearing convened by the GAO, Mr. Ray testified that the Air Force (1) considered the GaN HPA and [. . .] as the new and novel critical technologies that required TRL assessment; (2) did not consider the circulator to be a critical technology; (3) determined that although [. . .] the circulator [. . .] would require [. . .] to be redesigned, neither of the critical technologies in CTE 1 (the GaN HPA and [. . .]) were affected by the design change; (4) did not believe that [. . .] the circulator would impact performance; and (5) did not request, and Raytheon did not provide, any information regarding the proposed redesigned [. . .], such as the new design or test data.  Id. at 17.  Upon considering all of the evidence, the GAO attorney advised the parties during the outcome prediction conference that she intended to sustain Lockheed's protest on this issue.  Id. at 19-20.  She stated that the record reflected that Raytheon's CTE 1 was the [. . .] GaN HPA [. . .], not just the GaN HPA and [. . .], and that Raytheon's [. . .], as redesigned with the circulator [. . .], was never tested.  Id. at 19.  Accordingly, she opined that the Air Force erred in concluding that Raytheon's

CTE 1 was at TRL 6.  Id. at 20.  The Air Force decided to take corrective action based on the GAO attorney's determinations.  Id.

### b. The Court's Ruling

Based on the evidence in the administrative record, the court concluded that the Air Force did not comply with the evaluation scheme set forth in the solicitation.  Specifically, it explained:

> Based on the contemporaneous evidence contained in the administrative record, it is readily apparent that despite the various labels used to denote Raytheon's CTE 1, the independent review team and the Air Force's technical evaluators focused their evaluation of the maturity of Raytheon's CTE 1 on the new and novel aspects of the GaN HPA [. . .]–the GaN HPA and [. . .].  Indeed, neither the members of the independent review team nor the Air Force's technical evaluators–the individuals with the relevant knowledge and expertise–expressed any concern that the introduction of COTS circulators or the [. . .] would affect the TRL of Raytheon's CTE 1.

> Normally, a procuring agency's technical assessments, such as the ones made by the Air Force with respect to Raytheon's CTE 1, must be afforded the greatest possible deference.  E.W. Bliss Co. v. United States, 77 F.3d 445, 449 (Fed. Cir. 1996); Beta Analytics Int'l, Inc. v. United States, 67 Fed. Cl. 384, 395 (2005) ("The evaluation of proposals for their technical excellence or quality is a process that often involves the special expertise of procurement officials, and thus reviewing courts give the greatest deference possible to these determinations."). . . .  In light of the highly deferential standard applicable in these circumstances, the court has no difficulty concluding, based on the evidence in the administrative record, that the independent review team and the Air Force's technical evaluators reasonably assessed that the design change proposed by Raytheon would not affect the TRL of Raytheon's CTE 1.  The members of the independent review team in particular possessed expertise in radar system design, hardware, software, testing, and signal processing, and it is eminently reasonable to conclude that they applied that expertise in determining that the use of COTS circulators and the redesign of the [. . .] would not affect the technical maturity of Raytheon's GaN HPA [. . .].

> Problematically, however, the Air Force did not comply with the solicitation when it evaluated Raytheon's GaN HPA [. . .].  Pursuant to the solicitation, the contractors were required to substantiate a TRL 6 assessment for any CTEs that had changed since the conclusion of the pre-EMD period.  Raytheon's CTE 1 was its GaN HPA [. . .], and not just portions of its GaN HPA [. . .], such as the GaN HPA or [. . .].  Accordingly, Raytheon was required to substantiate that the changes it made to the design of its GaN HPA [. . .]–using

COTS circulators and [. . .]–did not affect the TRL of the GaN HPA [. . .].
Raytheon did not do so.  Thus, the Air Force's conclusion that Raytheon
substantiated TRL 6 ratings for each of the CTEs that had changed since the pre-
EMD period was erroneous.  The Air Force should have required Raytheon to
substantiate the TRL 6 rating of its changed CTE 1, and its failure to do so caused
its assessment of Raytheon's CTE 1 to be in violation of the evaluation scheme set
forth in the solicitation.  The Air Force's evaluation of the technical maturity of
Raytheon's CTE 1 was therefore arbitrary and capricious.  See, e.g.,
CRAssociates, Inc. v. United States, 102 Fed. Cl. 698, 713 (2011) (noting that a
procuring agency's departure from the evaluation scheme set forth in a solicitation
can "lead to the award . . . being set aside as arbitrary, capricious or otherwise
contrary to law").  Consequently, the GAO attorney's findings on this issue were
rational, and the Air Force's reliance on her findings in deciding to take corrective
action was also rational.

Id. at 36-37.

### c.  Raytheon's Contention

In disagreeing with the court's ruling, Raytheon focuses on the provisions of the
solicitation concerning the information that offerors were required to provide regarding CTEs
and the criteria by which the Air Force would evaluate changed CTEs.  Specifically, Raytheon
contends that there was no language in the solicitation requiring offerors to provide
substantiation of TRL 6 for changed CTEs that postdated the changes made to the CTEs–in other
words, new substantiation.  Therefore, Raytheon argues, it was permitted to submit substantiation
with its proposal that was based on assessments made during the pre-EMD period and predated
the changes it made to its CTE 1.  Raytheon further argues that the Air Force's technical
evaluators were entitled to rely on such substantiation if they believed that it was adequate to
support the TRL 6 assessment for that CTE.  During the earlier proceedings before this court,
Raytheon strenuously argued that the Air Force's technical evaluation of its CTE 1 should be
afforded great deference.  However, Raytheon did not specifically argue, as it does now, that
under the relevant language of the solicitation, it was not required to provide substantiation of
changed CTEs that postdated the changes to those CTEs.  The court therefore did not address that
argument in its decision denying Raytheon's bid protest.  Nevertheless, in furtherance of the full
and fair administration of justice, the court will describe Raytheon's newly advanced contention.

In its May 11, 2015 Opinion and Order, the court, without the benefit of Raytheon's
present argument, interpreted the solicitation to require offerors to substantiate TRL 6
assessments for changed CTEs using evidence that postdated the changes.  Pursuant to section L
of the solicitation, offerors were to provide, for each changed CTE, "the current TRL, the source
of the rating, and full substantiation with supporting data."  And, pursuant to section M of the
solicitation, the Air Force was required to determine whether offerors substantiated a TRL 6
assessment for all changed CTEs.  A fair reading of these provisions is that the Air Force was

concerned that an offeror might redesign a CTE to lower its costs (and, hence, its proposed price) without regard for whether the CTE's technical maturity would be adversely affected.  Thus, to mitigate that risk, the Air Force wanted evidence that the offeror assessed the TRL of the CTE after it redesigned the CTE to ensure that the CTE's TRL was not adversely affected by the design change.

However, as Raytheon notes in its RCFC 62(c) motion, the relevant solicitation provisions do not expressly limit what evidence an offeror could provide to substantiate a TRL 6 assessment of a changed CTE.  Accordingly, Raytheon asserts, offerors could provide evidence that either predated or postdated the change to the CTE,[2] and it was the Air Force's responsibility to determine whether that evidence was sufficient.  Raytheon's interpretation of the solicitation is not unreasonable.  Nevertheless, the Air Force ultimately concluded that the language of the solicitation it drafted required a different result.  Hence, it determined that corrective action was appropriate.

In sum, there exist two fair readings of the relevant solicitation provisions–the one acted upon by the Air Force, the agency that drafted the solicitation, and the one newly advanced by Raytheon in its RCFC 62(c) motion.  Given that the court was not asked to evaluate Raytheon's present contentions when ruling on the parties' cross-motions for judgment on the administrative record, the determination of which interpretation of the relevant solicitation provisions is correct will necessarily be for the Federal Circuit to decide in the first instance.  As such, the court cannot conclude that Raytheon has made a strong showing of a likelihood of success on the merits or even a substantial case on the merits on this aspect of its appeal.  See Hilton, 481 U.S. at 776; Standard Havens Prods., 897 F.2d at 512; Alaska Cent. Express, 51 Fed. Cl. at 229; see also Nken v. Holder, 556 U.S. 418, 434 (2009) (noting that to make the required showing, "[i]t is not enough that the chance of success on the merits be better than negligible" and that "[m]ore than a mere possibility of relief is required" (internal quotation marks omitted)).  As discussed

---

  [2]  In its reply in support of its RCFC 62(c) motion, Raytheon contends that "[t]he CTE's post-change TRL must be substantiated, but there is no reason that the substantiation must involve more testing or data when a modification is so innocuous as not to affect the CTE's technology maturity."  Reply 6.  It then remarks that "[h]ypothetically, if the design change involved no more than a different color for the CTE's housing, surely the CTE need not be retested in order to prove that the TRL rating is unaffected" and that "there is obviously a continuum of design changes with regard to their relative impact on the CTE's technology maturity."  Id.  Raytheon's hypothetical scenario is unavailing.  While the court agrees with Raytheon's proposition that there is a continuum of design changes–on one end of the continuum are the design changes that are so significant that they most assuredly would affect technical maturity, and at the other end of the continuum are the design changes that are so minor that they most assuredly would not affect technical maturity–the solicitation makes no such distinction.  Rather, offerors were to identify any CTE that had changed since the pre-EMD period and substantiate a TRL 6 assessment for those changed CTEs.

below, the court reaches the same conclusion with respect to Raytheon's contentions regarding the cost/price discussions.

## 2. The Cost/Price Discussions

### a. Factual Background

As noted above, in the solicitation for the current phase of the 3DELRR procurement, the Air Force described the proposal requirements and its evaluation criteria. Slip op. 5-7. In section L of the solicitation, the Air Force indicated that offerors were to identify and support their proposed cost reductions in the cost/price volumes of their proposals. Id. at 6. Then, in section M of the solicitation, the Air Force described its criteria for evaluating proposed costs and prices. Id. at 7. The Air Force's evaluation was to include an assessment of whether the offerors' cost/price proposals were reasonable and realistic. Id.

Raytheon, Lockheed, and Northrop proposed vastly different approaches to reducing the costs of contract performance. In its proposal, Raytheon identified [. . .] in cost reductions that included [. . .] for independent research and development ("IR&D"). Id. at 8. In contrast, Lockheed proposed [. . .]. Id. And, Northrop identified [. . .] cost reductions totaling [. . .], but did not include a reduction for IR&D. Id. After accounting for their cost reductions, Raytheon offered the lowest total price [. . .]; Northrop offered [. . .]; and Lockheed offered [. . .]. Id. at 9.

During discussions, the Air Force sent similar ENs to Raytheon and Northrop regarding the reasonableness and realism of their proposed cost reductions. Id. at 10. Both ENs provided:

> In accordance with (IAW) [Federal Acquisition Regulation ("FAR")] 31.205-18 and [10 U.S.C. § 2320], any cost claimed or considered to be IR&D or a capital investment shall not be allowable as indirect charges for work implicitly required for performance (necessary to perform the contract) or explicitly required to be done by the terms of the contract. Any such costs should be considered as direct charges to the 3DELRR contract. Further, unless properly segregated and agreed to as unallowable costs IAW FAR Part 31, any such costs may be deemed unrealistic.

Id. In its response to this EN, Raytheon challenged the Air Force's interpretation of the rules regarding the allowability of IR&D costs, noting that the United States Court of Appeals for the Federal Circuit ("Federal Circuit") had held in ATK Thiokol, Inc. v. United States, 598 F.3d 1329 (Fed. Cir. 2010), that research and development costs were allowable as IR&D costs unless specifically required by the contract. Slip op. 11. In contrast, Northrop did not raise any objections to the Air Force's statements regarding the allowability of IR&D costs. Id. Moreover, in response to another EN in which the Air Force requested information, such as "[. . .]/IR&D planning statements," to substantiate how Northrop planned to fund contract performance during

three specified fiscal years, Northrop explained that "[t]he execution of this contract does not require [. . .]/IR&D funding . . . ." Id. at 9.

As later explained at the GAO hearing, upon reviewing Raytheon's EN response and consulting with the Defense Contract Management Agency, the Air Force changed its position with respect to the allowability of IR&D costs; it determined that Raytheon's position was correct. Id. at 12, 17-18. Accordingly, in the follow-up EN that it sent to Raytheon, the Air Force did not address Raytheon's statements regarding IR&D costs, id. at 12, suggesting that it accepted Raytheon's position. However, in the follow-up EN that it sent to Northrop, the Air Force did not advise Northrop that it had changed its position regarding the allowability of IR&D costs and that its earlier statement was therefore incorrect. Id. Further, although the Air Force did not send an EN regarding the allowability of IR&D costs to Lockheed, it [. . .] during discussions. Id. at 13.

In its final proposal revision, Raytheon reduced its total proposed price to [. . .], which reflected an IR&D cost reduction of [. . .]. Id. Northrop proposed a price of [. . .] in its final proposal revision, an amount that [. . .]. Id. Lockheed, in its final proposal revision, [. . .] its total proposed price to [. . .], which reflected [. . .]. Id.

In its protest before the GAO, Northrop contended that the Air Force's cost/price discussions were misleading because the Air Force accepted Raytheon's understanding of the allowability of IR&D costs, but never advised Northrop of its changed understanding, preventing it from proposing IR&D cost reductions in line with the IR&D cost reductions proposed by Raytheon [. . .]. Id. at 16. Specifically, it contended:

> If Northrop Grumman had known of the Air Force's changed interpretation, it would have responded by protesting the interpretation's illegality and/or submitting a radically changed proposal. Northrop Grumman is a very large corporation with billions in assets and revenue. [. . .] Had Northrop Grumman known of the Air Force's expansive view of IR&D, which permitted offerors to propose IR&D that violated the FAR and the Air Force instruction provided to Northrop Grumman, Northrop Grumman could have proposed the types and quantities of IR&D [. . .].

Id. Upon considering all of the evidence, the GAO attorney advised the parties during the outcome prediction conference that she intended to sustain Northrop's protest on this issue. Id. at 19-20. She stated that the record reflected that the Air Force changed its understanding regarding the allowability of future IR&D costs, but never advised Northrop of its changed understanding. Id. at 20. She therefore opined that the Air Force's discussions with Northrop were misleading and unequal. Id. The Air Force decided to take corrective action based on the GAO attorney's determinations. Id.

### b. The Court's Ruling

Based on the evidence in the administrative record, the court concluded that the Air Force's discussions with Northrop regarding the allowability of IR&D costs were misleading and unequal. Specifically, it explained:

> Raytheon contends that discussions regarding the allowability of IR&D costs were neither misleading nor unequal, and there is support in the administrative record for its position. During the first round of discussions, Northrop unambiguously disclaimed any reliance on IR&D cost reductions in response to one EN, and at the same time raised no objections to the Air Force's statements regarding the allowability of IR&D costs in response to a separate EN. As a result, when the Air Force decided not to pursue further discussions with Northrop regarding IR&D costs, there is a nonfrivolous argument to be made that the Air Force was merely tailoring its discussions to Northrop's proposal pursuant to FAR 15.306(d)(1).

> Nevertheless, the evidence in the administrative record weighs more heavily in favor of Northrop's contention that the discussions were misleading and unequal. After the Air Force received the contractors' responses to the initial set of ENs, it determined that a statement it had communicated to Raytheon and Northrop regarding the allowability of IR&D costs no longer accurately represented its position. By not lodging any further objections to Raytheon's [. . .] proposed IR&D cost reductions, the Air Force signaled [. . .] that it was permissible to propose such reductions. However, the Air Force never advised Northrop of its changed understanding of the allowability of IR&D costs. Through its silence, the Air Force misled Northrop into believing that it would not accept IR&D cost reductions. Moreover, by advising only Raytheon [. . .] that it would accept IR&D cost reductions notwithstanding the language of its ENs, the Air Force engaged in unequal discussions with the contractors. At bottom, it was the Air Force's duty to ensure that all three contractors were competing on a level playing field. See, e.g., Joseph L. DeClerk & Assocs., Inc. v. United States, 26 Cl. Ct. 35, 46 (1992), cited in [Sys. Application & Techs., Inc. v. United States, 691 F.3d 1374, 1383 (Fed. Cir. 2012)]; see also FAR 1.102-2(c)(3) (requiring procuring agencies to treat all prospective contractors "fairly and impartially"). By misleading Northrop regarding its position on the allowability of IR&D costs and advising only Raytheon [. . .] that it had changed its position, the Air Force violated that duty. Consequently, the GAO attorney's conclusion that the Air Force engaged in misleading and unequal discussions concerning the allowability of IR&D costs was rational, and the Air Force's reliance on her conclusion in deciding to take corrective action was also rational.

Id. at 41.

### c. Raytheon's Contentions

Raytheon contends that the court's conclusion that the Air Force acted rationally when deciding to take corrective action with respect to the misleading and unequal cost/price discussions is incorrect on two grounds. As an initial matter, Raytheon reiterates an argument that it first advanced during the merits proceedings:  the substantially similar ENs that the Air Force sent to Raytheon and Northrop contained a misstatement of law regarding the allowability of IR&D costs, and the Air Force's failure to correct its misstatement cannot constitute misleading or unequal discussions. In its May 11, 2015 Opinion and Order, the court rejected this argument, concluding that the FAR's requirement of a fair and level playing field during all aspects of a procurement superseded the decisional law cited by Raytheon in which the courts ruled that misrepresentations of law cannot, absent unusual circumstances, form the basis for rescinding or reforming a contract between the federal government and a private party.[3] Raytheon now contends that the applicability of the misstatement-of-law precedent to discussions conducted during a procurement is an issue of first impression that should be considered, de novo, by the Federal Circuit on appeal.

Specifically, Raytheon contends that there is a substantial likelihood that it will succeed on the merits on appeal because (1) there is no distinction between a misstatement of law made by the government during the discussions phase of a procurement and a misstatement of law discovered by a contracting party after the execution of the contract; (2) a misstatement of law is analogous to a patent ambiguity and must be challenged prior to contract award; and (3) the court erroneously focused on the Air Force's actions and disregarded Northrop's knowledge of the law. The court is not persuaded by Raytheon's contentions.

There is no question that the misstatement-of-law principle applies to contracts awarded via a competitive procurement. Indeed, had the Air Force advised all of the offerors that it intended to interpret the law concerning the allowability of IR&D costs in one manner, but then, upon determining that it was mistaken, did not advise any of the offerors of its changed interpretation, the offeror awarded the contract would likely be unsuccessful in requesting contract reformation or rescission to remedy the legal misstatement. Notably, however, in those circumstances, the Air Force would have treated the offerors equally by not advising any of them of its changed position. In contrast, under the circumstances that actually exist in this case, the Air Force did not treat all of the offerors equally; once it determined that its interpretation of the

---

[3] In the decisions relied upon by Raytheon, the party alleging a misstatement of law was either the party in contractual privity with the federal government or the legal representative of the party in contractual privity. See generally Mills v. United States, 410 F.2d 1255 (Ct. Cl. 1969); Edwards v. United States, 19 Cl. Ct. 663 (1990); C & L Constr. Co. v. United States, 6 Cl. Ct. 791 (1984). In contrast, although Raytheon is in contractual privity with the Air Force, it is not seeking the rescission or reformation of their contract. Rather, Raytheon is challenging the ability of another offeror to seek the rescission of Raytheon's contract with the Air Force.

law was mistaken, it suggested to some, but not all, of the offerors that its position had changed. Therefore, regardless of what Northrop knew or did not know about the law concerning the allowability of IR&D costs, it did not know how the Air Force actually planned to treat IR&D costs–information that the Air Force provided to Raytheon [. . .].  With the benefit of the GAO attorney's outcome prediction statement, the Air Force recognized that it had supplied the offerors with different information regarding the allowability of IR&D costs and appropriately decided to take corrective action to remedy the information disparity.

The second basis for Raytheon's challenge to the court's conclusion that the Air Force acted rationally in deciding to take corrective action is that the court erred in concluding that Northrop had established prejudice before the GAO.  As with its previous contention, Raytheon first made this argument during the merits proceedings.  The court rejected Raytheon's arguments in its May 11, 2015 Opinion and Order, noting that the evidence in the record before the GAO–that (1) all three contractors submitted technically acceptable proposals; (2) the difference between Northrop's final proposed price of [. . .] and Raytheon's final proposed price of [. . .] was [. . .]; (3) Raytheon proposed IR&D cost reductions of [. . .]; and (4) Northrop is a large government contractor with extensive financial resources–was sufficient to support the implicit conclusion of the GAO attorney that Northrop possessed the financial means to propose IR&D cost reductions [. . .], making it possible for Northrop to overcome the differential in proposed prices.

Raytheon has not persuaded the court that its original ruling regarding prejudice was incorrect.  As noted by the court in its May 11, 2015 Opinion and Order, a protestor can prevail on a claim only if it demonstrates that it was prejudiced by a significant error in the procurement process.  Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996).  To establish prejudice, a protestor need not prove that it would have won the contract but for the alleged error in the procurement.  Bannum, Inc. v. United States, 404 F.3d 1346, 1358 (Fed. Cir. 2005).  Rather, a protestor "must show that there was a 'substantial chance' it would have received the contract award absent the alleged error."  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004) (quoting Emery Worldwide Airlines, Inc. v. United States, 264 F.3d 1071, 1086 (Fed. Cir. 2001)).  The evidence in the record before the GAO is sufficient to meet this standard.  Contrary to Raytheon's assertion, Northrop was not required to provide the GAO with specific examples of IR&D cost reductions it could propose to demonstrate a substantial chance of being awarded the contract had the Air Force not conducted unequal and misleading discussions; it was enough that Northrop demonstrated its capacity to propose such cost reductions.

Moreover, in arguing that Northrop did not adequately establish prejudice before the GAO, Raytheon imposes requirements on the GAO that have no basis in the law.  The Air Force's decision to take corrective action was based on a GAO attorney's outcome prediction statement, not a formal GAO decision.  There is no statutory or regulatory requirement that such a statement address every finding that would be required in a written decision from the GAO.  Indeed, it would defeat the purpose of outcome prediction–the prompt resolution of protests, see

4 C.F.R. § 21.10(e) (2014)–if the assigned GAO attorney was required to address every element of a protestor's claim during the outcome prediction conference. Thus, Raytheon's attempt to impute such a requirement on the GAO attorney in this case is untenable.

In short, Raytheon has not established a likelihood of success on the merits, or even a substantial case on the merits, with respect to the Air Force's decision to take corrective action to remedy its misleading and unequal cost/price discussions.

## B. The Equitable Factors

Raytheon has not demonstrated either a likelihood of success or a substantial case on the merits of its appeal. However, assuming, strictly for the for the sake of argument, that Raytheon had established at least a substantial case on the merits, it would not be entitled to relief under RCFC 62(c) because, as explained below, Raytheon has not demonstrated that the equitable factors weigh in its favor.

### 1. Irreparable Injury

"When assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'" Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000) (quoting Magellan Corp. v. United States, 27 Fed. Cl. 446, 447 (1993)); see also Younger v. Harris, 401 U.S. 37, 43-44 (1971) (noting that "the basic doctrine of equity jurisprudence [is] that courts of equity should not act . . . when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief"). Raytheon first contends that it would be irreparably injured if the Air Force was permitted to take corrective action because it would be "forced to expend the time, effort, and expense to recompete with itself as well as with Lockheed and Northrop for the contract that [it] already lawfully won, and to demonstrate the maturity of technology" that has already been found to be technically mature. Mot. 16. In both of the decisions relied upon by Raytheon in support of this contention, the court determined that the corrective action proposed by the government was unlawful; in other words, the protestors–the original contract awardees– succeeded on the merits of their claims. See Sys. Application & Techs., Inc. v. United States, 100 Fed. Cl. 687, 719 (2011), aff'd, 691 F.3d at 1374; Sheridan Corp. v. United States, 95 Fed. Cl. 141, 154 (2010). As a result, the court in each case concluded that the protestors would be irreparably injured by having to unnecessarily recompete for contracts that, as confirmed by the court, they had already lawfully won. Sys. Application & Techs., 100 Fed. Cl. at 720-21; Sheridan Corp., 95 Fed. Cl. at 155.

Raytheon, however, is not in the same position as the protestors in Systems Application & Technologies and Sheridan Corp. In its May 11, 2015 Opinion and Order, the court concluded that the Air Force's decision to take corrective action was a rational response to errors in the procurement. In other words, the court concluded that Raytheon could not be considered the lawful awardee of the EMD contract. If the contract was not properly awarded to Raytheon in

the first instance, Raytheon being required to compete for the contract anew does not constitute an irreparable injury. Moreover, Raytheon has not established that it is likely to succeed, or has a substantial case, on the merits of its appeal before the Federal Circuit. As a result, the court cannot characterize the recompetition as unnecessary and, consequently, it cannot characterize Raytheon's participation in the recompetition as an irreparable injury. See also Nken, 556 U.S. at 434-35 (noting that the possibility of irreparable injury is insufficient to satisfy the factor).

Raytheon also contends that if the Air Force quickly takes corrective action and awards a new EMD contract before the Federal Circuit rules on its appeal, it would be left without a remedy. This contention is not compelling. If, after corrective action, the Air Force awarded Raytheon the EMD contract for a second time, Raytheon would still have a claim for bid preparation and proposal costs incurred during the purportedly unnecessary recompetition. See 28 U.S.C. § 1491(b)(2) (2012). And, an award of the EMD contract to Lockheed or Northrop after corrective action would not moot Raytheon's claim that the decision to take corrective action was irrational; if the Air Force chose to proceed with contract performance with the new awardee, it would be doing so at the risk of having its decision to take corrective action overturned and the newly awarded contract invalidated.

Finally, Raytheon contends that it would be irreparably injured if it prevails on appeal after being forced to recompete for the EMD contract because it would have expended additional resources to win a contract that it had already won. Such an injury is not irreparable; Raytheon conceivably could amend its complaint or file a new complaint, as appropriate, to recover bid preparation and proposal costs for any costs it incurred during its participation in a new competition later deemed to be improper. See id.

In sum, Raytheon has not established that it would be irreparably injured if it was denied relief under RCFC 62(c). Although this finding would be sufficient to end its inquiry on the equitable factors, the court will address the other factors for the sake of completeness.

### 2. Harm to the Other Interested Parties

Under the next equitable factor, Raytheon argues that the harm it would suffer in the absence of relief under RCFC 62(c) outweighs the harm to the Air Force if the court prevented the Air Force from taking corrective action and rewarding the EMD contract.[4] In advancing this argument, Raytheon does not identify any way in which the Air Force might be injured if the court granted its RCFC 62(c) motion. Rather, Raytheon contends that the Air Force would be injured if the court denied Raytheon's motion and permitted the Air Force to take corrective

---

[4] Raytheon does not address the harm that might be suffered by the other interested parties–Lockheed and Northrop. A discussion of the harms that those contractors might suffer if the court prevented the Air Force from taking corrective action and rewarding the EMD contract is not necessary for the resolution of Raytheon's RCFC 62(c) motion.

action and reaward the EMD contract.  In those circumstances, Raytheon asserts, the Air Force would be expending resources for an unnecessary recompetition.

In its response to Raytheon's RCFC 62(c) motion, defendant, unsurprisingly, describes how the Air Force would be harmed if it was not permitted to proceed with corrective action.  It generally contends that if the court granted Raytheon's motion, the Air Force's mission would be adversely affected and the Air Force would incur additional costs to sustain the existing radar system.  Specifically, it contends that (1) the existing radar system "[. . .], limiting the system's ability to distinguish between our aircraft and an adversary aircraft" and rendering the 3DELRR system critical to national defense; (2) the existing radar system "is reaching the end of its service life and is becoming more difficult and costly to maintain"; (3) because each existing radar system is operational only [. . .], the Air Force must [. . .] existing radar systems "[. . .] to ensure that near-continuous air surveillance can be maintained to support ongoing operations"; and (4) there are "diminishing manufacturing sources for spare parts and material shortages," leading to increased maintenance costs for the existing radar system.  Def.'s Resp. 17-18 (relying on a declaration from Steven D. Wert, the Air Force Program Executive Officer for Battle Management at the Air Force Life Cycle Management Center, Hanscom Air Force Base, Massachusetts).  In sum, defendant asserts that the delay in the 3DELRR procurement that would result from preventing the Air Force from taking corrective action would be harmful because the Air Force would be required "to extend the useful life of an increasingly expensive and less effective radar system." Id. at 18.

Raytheon disputes defendant's assertion that the Air Force would be harmed if the court prevented it from taking corrective action.  In particular, Raytheon contends that the Air Force cannot be very concerned over the prospect of a delay in the 3DELRR procurement because (1) it did not seek to override the automatic stay of performance put in place when Northrop and Lockheed lodged their protests at the GAO and (2) it voluntarily stayed taking corrective action during the pendency of this bid protest.[5]  However, Raytheon fails to acknowledge that the GAO is required by statute to resolve bid protests within 100 days, 31 U.S.C. § 3554(a) (2012), and that a procuring agency typically will agree to maintain the status quo if the United States Court of Federal Claims agrees to resolve the bid protest in an expeditious manner.  In other words, the delays in those circumstances are known quantities.  In contrast, even when the Federal Circuit agrees to an expedited briefing and argument schedule for an appeal, as it has in this case, it is not obligated to issue an expedited decision on the appeal.  Because the date of the Federal Circuit's decision cannot be ascertained, the Air Force would have no way of knowing how long the 3DELRR procurement might be delayed if the court granted Raytheon's RCFC 62(c) motion.

---

[5] Raytheon advances a number of other arguments regarding the harm that might be suffered by the Air Force if the court prevented the Air Force from taking corrective action.  However, those arguments are aimed at the substance of Mr. Wert's declaration, and not at the harm alleged by defendant in its response to Raytheon's RCFC 62(c) motion.  Accordingly, the court declines to address them.

The court finds that the Air Force would be harmed by such an indeterminate delay in a critical procurement.

In fact, contrary to Raytheon's contention otherwise, the delay of the 3DELRR procurement could be substantial if the court granted Raytheon's RCFC 62(c) motion.  In a declaration filed with the Federal Circuit and subsequently filed in this court, the Air Force represents that it does not anticipate completing its corrective action and reawarding the EMD contract until early December 2015–approximately six months from now.  Thus, if the court granted Raytheon's RCFC 62(c) motion but the Federal Circuit denied Raytheon's appeal, the delay to the 3DELRR procurement would equal the time that the Federal Circuit took to issue its decision (briefing and argument will themselves take three months), plus the six months the Air Force needs to take corrective action.  In short, the delay would be at least nine months.

To conclude, given that Raytheon has not established an irreparable injury and that defendant has demonstrated that a delay could seriously harm the Air Force, the balance of harms does not weigh in Raytheon's favor.

### 3. Public Interest

In addressing the third equitable factor, Raytheon correctly asserts that "the public has a strong and overriding interest in maintaining the integrity of the procurement process."  Mot. 17-18.  It argues that the Air Force's decision to take corrective action and the court's conclusion that the Air Force's decision was rational "will upset a lawful contract, and sanction a subsequent unfair competition in which Raytheon must compete against itself for a contract it already won, due to" the Air Force's disclosure of its price to Lockheed and Northrop during postaward debriefings.  Id. at 18.  Raytheon also contends that "the diversion of critical Agency resources to an unnecessary competition . . . thwarts the public interest."  Id.

Defendant, in turn, advances three reasons why the public interest supports allowing the Air Force to proceed with its corrective action.  First, it contends that the court has already examined and upheld the Air Force's decision to take corrective action, and that there is a public interest in allowing an agency to conduct a procurement without excessive judicial interference.  Second, it asserts a national security interest in replacing the existing, aging radar system with a radar system that is capable of detecting current threats.  Third, it argues that the public's interest in the integrity of the procurement process is best served by having the Air Force conduct the 3DELRR procurement in accordance with the solicitation and the FAR, which the proposed corrective action will accomplish.

The court agrees with defendant that the public interest is best served when a procurement is conducted openly and fairly in accordance with the solicitation and the FAR.  See, e.g., Bona Fide Conglomerate, Inc. v. United States, 96 Fed. Cl. 233, 242 (2010); PGBA, LLC v. United States, 57 Fed. Cl. 655, 663 (2003); Overstreet Elec., 47 Fed. Cl. at 744.  In this

case, the Air Force determined that corrective action was necessary to comply with the solicitation and the FAR, and the court concluded that the Air Force's determination was rational. Consequently, the public's interest in an open and fair competition is aligned with the status quo. Raytheon has therefore not established that the public interest weighs in its favor.

### C. Weighing the Four Factors

In sum, Raytheon has not demonstrated either a likelihood of success or a substantial case on the merits of its appeal. Nor has Raytheon established that the remaining equitable factors–irreparable injury, injury to the other interested parties, and the public interest–weigh in its favor. Accordingly, Raytheon is not entitled to relief under RCFC 62(c).

### III. CONCLUSION

For the reasons set forth above, the court **DENIES** Raytheon's motion for a stay of the court's judgment and to enjoin the Air Force from proceeding with its proposed corrective action or awarding a new contract pending appeal.

The court has filed this ruling under seal. The parties shall confer to determine agreed-to proposed redactions. Then, by **no later than Wednesday, June 17, 2015**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

Also, the parties have not yet filed redacted versions of all of the documents that they filed under seal.[6] Paragraph 12 of the February 12, 2015 amended protective order contemplates that the parties will complete the redaction process promptly. Accordingly, the parties shall be in full compliance with the redaction requirement **as soon as possible, but by no later than Friday, July 10, 2015**.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge

---

[6] As of the date of this decision, redacted versions of the following sealed documents have not been filed: docket entries 50, 52, 56, 58, 59, 66, 70, 72, 73, 74, 86, 87, 92, 93, 94, 95, and 97.